UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| KORLUH KENNEDY, * <br> * <br> Plaintiff, * <br> * <br> v. * <br> * <br> COMMONWEALTH OF * <br> MASSACHUETTS, *et al*, * <br> * <br> Defendants. * | Civil Action No. 4:22-cv-11152-NMG <br> (Leave to file granted 11/04/22) |

## MEMORANDUM OF *AMICUS CURIAE* <br> AMERICAN CIVIL LIBERTIES UNION OF MASSACHUSETTS

### INTRODUCTION

Supreme Court and First Circuit precedent firmly establishes the availability of a damages remedy against a federal law enforcement officer who searches a home, without a valid warrant and absent an exception to the warrant requirement, while engaged in a drug investigation. *See Bivens v. Six Unknown Fed. Narcotics Agents*, 403 U.S. 388, 397 (1971); *DeMayo v. Nugent*, 517 F.3d 11, 14–16 & n.5 (1st Cir. 2008); *see also Pagán-González v. Moreno*, 919 F.3d 582, 586–87 (1st Cir. 2019) (*Bivens* claim could proceed where FBI officers engaged in child pornography investigation unreasonably searched home without legal justification). That is precisely what plaintiff Korluh Kennedy alleges here against defendant Joseph F. Osmanski III. Under *Bivens* itself, as well as *DeMayo* and *Pagán-González*, Kennedy has stated a claim on which relief may be granted.

Yet Osmanski argues otherwise. In doing so, Osmanski does not explicitly claim that *Bivens* has been overruled; in fact, his memorandum never uses the word "overrule." Nor does Osmanski attempt to distinguish *DeMayo* or *Pagán-González*; in fact, his memorandum does not cite them. Instead, he effectively asks this Court to ignore decades of binding precedent based on

a prediction that, in light of the Supreme Court's recent pronouncements in *Egbert v. Boule*, 142 S. Ct. 1793 (2022), the precedent that controls this case will be overturned someday.

That is not how the rule of law operates. *Egbert* does not govern this case. It did not overturn the cases that do: *Bivens*, *DeMayo*, and *Pagán-González*. Nor did it call into question the reasoning of those governing cases. Under the doctrines of stare decisis and law of the circuit, which are among "the sturdiest 'building blocks on which the federal judicial system rests,'" *United States v. Barbosa*, 896 F.3d 60, 74 (1st Cir. 2018) (quoting *San Juan Cable LLC v. P.R. Tel. Co.*, 612 F.3d 25, 33 (1st Cir. 2010)), this Court should deny Osmanski's motion to dismiss.

## INTERESTS OF AMICUS CURIAE

The American Civil Liberties Union of Massachusetts, Inc. (ACLUM) is a membership organization dedicated to the principles of liberty and equality embodied in the constitutions and laws of the Commonwealth and the United States. The rights that ACLUM defends through direct representation and amicus briefs include the right to be free from unreasonable searches and seizures. ACLUM has a longstanding interest in ensuring that civil rights and civil liberties meaningfully protect people, which cannot happen if federal agents are needlessly immunized for violating the law and the constitution.

## SUMMARY OF RELEVANT FACTUAL ALLEGATIONS[1]

In the early morning of April 10, 2019, Kennedy awoke to loud banging at her front door from armed law enforcement officers, including Federal Bureau of Investigation (FBI) Special Agent Osmanski, who demanded to be let inside. Compl., ECF No. 27-2, ¶¶ 4, 65, 66–67. The

---

[1] In ruling on a motion to dismiss, a district court assumes "the truth of all well-pleaded facts" and draws "all reasonable inferences in the plaintiff's favor." *Nisselson v. Lernout*, 469 F.3d 143, 150 (1st Cir. 2006).

officers pointed their weapons at Kennedy and her tenant, a young mother who was nursing her infant. *Id.* at ¶¶ 68–69. As soon as Kennedy opened the door, the officers rushed inside the home without her consent. *Id.* at ¶ 70. Kennedy thought that she was going to die. *Id.* at ¶ 71.

The officers had a default warrant for Kennedy's son, Augustus Kormah, who had failed to appear at his arraignment on a simple possession charge several weeks earlier. *Id.* at ¶¶ 40, 50–51, 62. The officers had initially searched for Kormah at his home address. *Id.* at ¶ 60. When they did not find him there, they decided to search his mother's house. *Id.* at ¶ 61.

When the officers arrived, they realized that Kormah's car was not parked at Kennedy's. *Id.* at ¶ 64. Kennedy also immediately told the officers that Kormah did not live with and was not staying with her. *Id.* at ¶ 73. Nevertheless, the officers searched her entire home—from garage to attic—for more than half an hour. *Id.* at ¶¶ 74, 78. Although they did not have a search warrant for Kennedy's home, the officers opened boxes and called in two officers with police dogs to conduct a more invasive search. *Id.* at ¶¶ 74–75, 80. One of the police dogs urinated on Kennedy's belongings, and the officers left her home in a disastrous condition. *Id.* at ¶¶ 76, 88.

When one of the officers eventually informed Kennedy that they did not have a search warrant for her home, she told them that she would call her lawyer. *Id.* at ¶¶ 80–81. It was only at that point that the officers left. *Id.* at ¶ 82.

## ARGUMENT

I.  **Binding Supreme Court and First Circuit precedent establishes an existing *Bivens* claim against federal agents who search a home without legal justification during routine narcotics investigations.**

Kennedy's claim falls squarely into a recognized *Bivens* cause of action. Osmanski's motion therefore asks this Court to issue a ruling that is directly contrary to binding precedent.

3

      A.      *A damages claim against a federal agent can proceed if it falls into a recognized* Bivens *cause of action.*

In *Bivens*, the Supreme Court recognized an implied cause of action for damages under the Fourth Amendment to compensate those injured by federal officials' violations of the prohibition against unreasonable searches and seizures. 403 U.S. at 397. The Court subsequently authorized *Bivens* claims in two additional contexts: sex discrimination in violation of the Fifth Amendment, *Davis v. Passman*, 442 U.S. 228 (1979), and failure to provide incarcerated people with adequate medical treatment in violation of the Eighth Amendment, *Carlson v. Green*, 446 U.S. 14 (1980).

Against that backdrop, courts use a two-step inquiry to analyze the availability of a damages remedy under *Bivens* in any given case. *Hernández v. Mesa*, 140 S. Ct. 735, 743 (2020).[2] First, the court analyzes whether recognizing the plaintiff's claim would extend *Bivens* to a "new context," which encompasses any claim that differs "in a meaningful way" from those already recognized by the Supreme Court or binding appellate court. *Id.* (quoting *Ziglar v. Abbasi*, 137 S. Ct. 1843, 1859 (2017)). If the claim does not arise in a new context, there is no need to proceed to step two. But if recognizing the claim would extend *Bivens* into a new context, the court proceeds to the second step, which asks if there are "special factors" that counsel hesitation about granting the extension. *Id.* Such factors might include:

> the rank of the officers involved; the constitutional right at issue; the generality or specificity of the official action; the extent of judicial guidance as to how an officer should respond to the problem or emergency to be confronted; the statutory or other legal mandate under which the officer was operating; the risk of disruptive intrusion by the Judiciary into the functioning of other branches; or the presence of potential special factors that previous *Bivens* cases did not consider.

*Abbasi*, 137 S. Ct. at 1860.

---

[2] As described *infra*, part II(A), *Egbert* did not eliminate the first step of this analysis.

*Egbert* left undisturbed those contexts in which the courts have *already* recognized viable *Bivens* claims, as well the need to inquire whether a given case falls into such an established context. 142 S. Ct at 1804–05, 1809. Here, the answer to that inquiry is unequivocally yes.

> B.   *This case falls within the first and best-established of the existing causes of action under* Bivens.

This case falls within the heartland of existing *Bivens* claims under Supreme Court and First Circuit precedent, which squarely recognizes a cause of action under the Fourth Amendment against federal agents who search a person's home without legal justification during a routine investigation.

*Bivens* itself involved five federal agents who forced their way into Webster Bivens's home without a warrant and searched the premises. 403 U.S. at 389–90 & n.2. The agents handcuffed Bivens in front of his wife and children and ultimately arrested him for narcotics violations without probable cause. *Id.* at 389. It was within this context—which mirrors Kennedy's experience—that the Supreme Court recognized an implied damages claim against federal officials for unreasonable searches and seizures. *Id.* at 397.

Although the Court has since exhibited restraint in *expanding* the *Bivens* remedy, *see Hernández*, 140 S. Ct. at 749–50; *Abbasi*, 137 S. Ct. at 1859–63, it has reiterated that "*Bivens* is well-settled law in its own context," *Abbasi*, 137 S. Ct. at 1848. Indeed, the Court has cautioned that its opinions are

> not intended to cast doubt on the continued force, or even the necessity, of *Bivens* in the search-and-seizure context in which it arose. The settled law of *Bivens* in this common and recurrent sphere of law enforcement, and the undoubted reliance upon it as a fixed principle in the law, are powerful reasons to retain it in that sphere,

*Id.* at 1856.

Applying this case law, the First Circuit has expressly authorized *Bivens* claims against federal law enforcement agents—including agents involved in drug investigations and FBI

5

agents—for Fourth Amendment violations based on unjustified house searches. *DeMayo*, 517 F.3d at 14–16 & n.5; *Pagán-González*, 919 F.3d at 586–87. In *DeMayo*, a federal Drug Enforcement Agency agent, along with state law enforcement officers, entered the plaintiff's home without a warrant during the controlled delivery of a suspicious package. 517 F.3d at 13–14. Although the officers claimed the existence of exigent circumstances, the First Circuit concluded they lacked any "particularized, case-specific facts" to support such an exigency and held that a plaintiff "may vindicate a proven violation of his or her right to be free from unreasonable searches through a *Bivens* action." *Id.* at 15–17 & n.6. In *Pagán-González*, FBI agents fabricated an emergency to gain consent to enter the home and search the computers of an individual suspected of distributing child pornography. 919 F.3d at 586–87. Concluding that the ruse vitiated any consent for the warrantless entry and search, the First Circuit once again reaffirmed the vitality of *Bivens* in the context of routine search-and-seizure violations by FBI agents. *Id.* at 597–601. *See also Hernandez-Cuevas v. Taylor*, 723 F.3d 91, 99–105 (1st Cir. 2013) (recognizing Bivens claim where plaintiff alleged that he was held in federal custody for three months without probable cause based on misconduct by FBI agents).

As in *DeMayo*, *Pagán-González*, and *Bivens* itself, this case involves a federal agent's unreasonable warrantless entry into someone's home. These are precisely the circumstances in which the Supreme Court has reiterated "the continued force" and "even the necessity, of *Bivens*." *Abbasi*, 137 S. Ct. at 1856. Because Kennedy's claim arises within that "well-settled" context of established *Bivens* claims, rather than a "new context," Osmanski's motion to dismiss must fail.

**II.        *Egbert* is inapplicable to claims involving routine search and seizure violations, and it neither overturns nor calls into question the precedent governing those violations.**

In seeking dismissal of Kennedy's damages claim, Osmanski ignores the binding *DeMayo*, *Pagán-González*, and *Hernandez-Cuevas* decisions and leans entirely on the Supreme Court's recent *Egbert* decision. *Egbert* refused to extend *Bivens* to the new context of a Border Patrol agent engaged in activities that—the Court emphasized—implicated national security. 142 S. Ct. at 1804. In arguing that *Egbert* mandates the dismissal of *Bivens* claims, like Kennedy's, that fall into well-established pre-*Egbert* contexts, Osmanski seeks what would amount to a ruling that *Egbert* overturned *Bivens* and all of its First Circuit progeny. *See, e.g.*, Def. Mem., ECF No. 33, at 8 (suggesting that Kennedy's claim should be categorized as seeking to extend *Bivens* to a new category of defendants, while failing to acknowledge the First Circuit's recognition of *Bivens* claims against FBI agents in both *Pagán-González* and *Hernandez-Cuevas*). This argument is incorrect in all respects. *Egbert* involved allegations that were dispositively different from those alleged here, *Egbert* does not govern this case, and *Egbert* did not abrogate the cases that do govern this case.

      A.        Egbert *held that special factors counselled against extending* Bivens *into the "new context" of border and national security.*

*Egbert*, which involved a Fourth Amendment claim against a U.S. Border Patrol agent in what the Supreme Court called "the border-security context," 142 S. Ct. at 1804, did not make any pronouncement that would allow Osmanski to avoid the straightforward application of *Bivens*, *DeMayo*, *Pagán-González*, and *Hernandez-Cuevas* to the facts alleged here. Plaintiff Robert Boule was the owner of an inn abutting the Canadian border. *Id.* at 1800. The town in which the inn was located was known as "a hotspot for cross-border smuggling," and the inn itself purportedly attracted drug traffickers and people seeking to illegally cross the border. *Id.* In

7

March 2014, Boule informed Erik Egbert, a Border Patrol agent, that a Turkish national would be driving to the inn later that day. *Id.* at 1801. Egbert followed a car that he suspected was transporting the guest onto the inn's driveway to check the guest's immigration status. *Id.* When Boule attempted to intervene, Egbert threw him against the car and then to the ground. *Id.* After confirming that the guest was lawfully in the United States, Egbert left. *Id.*

At the start of its analysis, the Court stated that the two-step *Bivens* inquiry "*often* resolve[s] to a single question: whether there is any reason to think that Congress might be better equipped to *create* a damages remedy." *Egbert*, 142 S. Ct. at 1803 (emphasis added). But it made that statement in the context of a case in which, in its view and the view of the court of appeals, the need to proceed to the second step—that is, to consider "special factors"—was unequivocal. *Id.* at 1804–05. The Court did not suggest that courts could skip the first step of the inquiry regarding whether a case presented a new context where the context was *squarely controlled* by existing *Bivens* case law. Instead, it began from the premise that *Egbert* "presented a new context for *Bivens* purposes," *id.* at 1804, and only then conducted a special factors analysis to conclude that *Bivens* should not be extended to cover this new context, *id.* at 1804–06.

Specifically, the majority began with a lengthy discussion of *Hernández v. Mesa*, in which the Court had previously declined to extend *Bivens* to facts involving a Border Patrol agent's fatal shooting of a Mexican national across the United States border. *Id.* at 1804 (citing *Hernández*, 140 S. Ct. at 739–40). Because that case—which caused an "international incident" between the United States and Mexico, *Hernández*, 140 S. Ct. at 740—related to "foreign affairs and national security" and had an "extraterritorial aspect," the Court reasoned that "the risk of undermining border security provide[d] reason to hesitate before extending *Bivens* into this field," *Egbert*, 142 S. Ct. at 1804 (quoting *Hernández*, 140 S. Ct. at 747).

The Court then turned to the national security considerations at play in *Egbert*: "[d]uring the alleged altercation with Boule, Agent Egbert was carrying out Border Patrol's mandate to 'interdic[t] persons attempting to illegally enter or exit the United States or goods being illegally imported into or exported from the United States.'" *Id.* (quoting 6 U.S.C. § 211(e)(3)(A)). Given this context, the Court held that, as in *Hernández*, national security concerns counselled against judicial creation of a new cause of action under *Bivens*; the policy determination of "whether a damages remedy *against any Border Patrol* agent [wa]s appropriate" fell within the congressional domain. *Id.* at 1805–06 (emphasis added).

While the majority opinion in *Egbert* uses the terms "border security" or "national security" more than a dozen times, these terms do not appear even once in Osmanski's brief. Instead, Osmanski—ignoring that dispositive context—claims that the *Egbert* majority denied the plaintiff a remedy under facts "'almost parallel'" to those in *Bivens*. Def. Mem., ECF No. 33, at 5, 8 (quoting *Egbert*, 142 S. Ct. at 1805). Yet *Egbert* itself explained that the excessive force at issue in that case was a mere "superficial similarit[y]" to *Bivens* specifically *because* the incident in *Egbert* occurred within the national security context. *Egbert*, 142 S. Ct. at 1805. *Egbert* undeniably stands for the proposition that courts may not create *new* causes of action under *Bivens* when national or border security interests are at stake. But those considerations are absent from this and other cases that invoke *existing* causes of action under *Bivens*.

B. *This case does not ask this Court to create a new damages cause of action.*

Osmanski contends that the facts of Kennedy's claim are "no less distinguishable from *Bivens* itself than those in *Egbert*." Def. Mem., ECF No. 33, at 6. That is not so. Along every dimension that the Supreme Court has identified as relevant to the question of whether a case presents a "new context" for purposes of *Bivens*, the facts here represent not an expansion but an

9

echo. In fact, Osmanski's proposed analysis asks this Court to reach a result directly contrary to *Bivens* and First Circuit case law. It should not.

First, Osmanski argues that it is a meaningful difference for the purposes of *Bivens* that he is an agent with the FBI not, as in *Bivens*, the now-defunct Federal Bureau of Narcotics. Def. Mem., ECF No. 33, at 8. As discussed previously, however, the First Circuit has already recognized *Bivens* actions under the Fourth Amendment against FBI agents, *Pagán-González*, 919 F.3d at 586–87; *Hernandez-Cuevas*, 836 F.3d at 99–102, and agents of the DEA, *DeMayo*, 517 F.3d at 14 n.5, which is the Federal Bureau of Narcotics' successor agency. FBI agents therefore are not a "new category of defendants," Def. Mem., ECF No. 33, at 8, under binding First Circuit precedent.

Second, Osmanski states that where *Bivens* concerned "a single, baseless, warrantless operation by drug enforcement agents," this case differs because an FBI agent allegedly conducted a warrantless search of Kennedy's home while attempting to execute an arrest warrant for her immediate family member. Def. Mem., ECF No. 33, at 8. But the presence of a valid arrest warrant does not meaningfully differentiate this case to constitute a "new context" for the purposes of *Bivens*. The First Circuit has already established that a *Bivens* claim will lie where a search or seizure conducted during a routine investigation is unreasonable under Fourth Amendment case law. For example, *DeMayo* recognized a *Bivens* claim despite the government's assertion that the search was legally justified by exigent circumstances, because existing law "consistently held that officers must be able to point to specific facts in the record to justify a warrantless entry based on exigent circumstances" and the officers had therefore acted unreasonably in searching the plaintiff's home where they had no case specific evidence to justify an exigency. 517 F.3d at 14–17. Similarly, *Pagán-González* recognized a *Bivens* claim

despite the government's assertion that the search was legally justified by consent, because "courts have regularly held that coercion is implicit when officers falsely present a need for urgent action" and the FBI had therefore acted unreasonably where their deception invalidated the plaintiff's consent. 919 F.3d at 595.

The law is equally clear that the search in this case was unreasonable even though there was an arrest warrant. While "an arrest warrant founded on probable cause implicitly carries with it the limited authority to enter a dwelling *in which the suspect lives* when there is reason to believe the suspect is within," *Payton v. New York*, 445 U.S. 573, 603 (1980) (emphasis added), an arrest warrant does *not* justify entry into or search of a third party's home absent exigent circumstances or consent, *see United States v. Steagald*, 451 U.S. 204, 212–16 & n.7 (1981). The Supreme Court has made clear that

> [a] contrary conclusion—that the police, acting alone and in the absence of exigent circumstances, may decide when there is sufficient justification for searching the home of a third party for the subject of an arrest warrant—would create a significant potential for abuse. Armed solely with an arrest warrant for a single person, the police could search all the homes of that individual's friends and acquaintances.

*Id.* at 215. Where the complaint in this case alleges that law enforcement had only an arrest warrant for Kormah and entered Kennedy's home without her consent and absent any exigent circumstances, the search was unreasonable, and a *Bivens* claim must lie. The context—an unreasonable search undertaken during a routine law enforcement investigation—is identical to that in *Bivens*, *DeMayo*, and *Pagán-González*.

Finally, Osmanski argues that "alternative remedial structures"—specifically the Department of Justice's internal grievance procedures, 31 U.S.C. § 3724, and the Federal Tort Claims Act—meet the "new context" standard for the purposes of *Bivens*. Def. Mem., ECF No. 33, at 10; *see also id.* at 11–16. In so doing, however, Osmanski erroneously conflates the

11

analysis regarding the creation of new causes of action with the adjudication of claims falling under existing causes of actions. *Cf. Egbert*, 142 S. Ct. at 1804 (noting that the existence of alternative remedial structures "is reason enough to limit the power of the Judiciary to infer *a new Bivens cause of action*") (emphasis added) (internal quotation marks omitted). If five federal agents forced their way into the home of someone named Webster Bivens without a warrant tomorrow, conducted an illegal search, and arrested him without probable cause, all three of the remedies described by Osmanksi would be available to him. Under Osmanski's reading, even facts identical to those in *Bivens* could not support a claim under *Bivens*. That is not correct. While *Egbert* may stand for the proposition that a court cannot extend *Bivens* into new contexts if alternative remedies exist, it did not eliminate those causes of action repeatedly reaffirmed by the Court. *See id.* at 1809.

   C.  Bivens *and its progeny in the First Circuit remain binding law.*

  Osmanski does not and cannot explicitly claim that *Egbert* abrogated or overruled *Bivens* or any First Circuit case that is controlling here. His arguments therefore seem to rely, implicitly, on the suggestion that the Supreme Court's apparent disinclination to expand *Bivens* authorizes this Court to proceed as though all *Bivens* case law is dead letter. But predictions about where the case law might be headed are no basis for this Court to disregard the case law that now exists.

  Stare decisis and the law of the circuit doctrine dictate that district courts cannot, except in certain narrow circumstances, ignore prior decisions of the Supreme Court and the First Circuit. *United States v. Moore-Bush*, 963 F.3d 29, 37 (1st Cir.), *reh'g en banc granted, opinion vacated on other grounds*, 982 F.3d 50 (1st Cir. 2020), and *on reh'g en banc*, 36 F.4th 320 (1st Cir. 2022) ("The Supreme Court has repeatedly stressed the importance of *both* circuit and district courts faithfully following vertical precedent") (emphasis original). These doctrines provide "stability and predictability to litigants and judges alike, while at the same time fostering

due respect for a court's prior decisions." *Barbosa*, 896 F.3d at 74 (citation omitted). The exceptions to the law of the circuit doctrine are "narrowly circumscribed and their incidence is 'hen's-teeth-rare.'" *Id.* (quoting *San Juan Cable LLC,* 612 F.3d at 33). The first "applies when the holding of a previous panel is contradicted by subsequent controlling authority, such as a decision by the Supreme Court, an *en banc* decision of the originating court, or a statutory overruling." *Id.* (citing *United States v. Rodríguez,* 527 F.3d 221, 225 (1st Cir. 2008)). The second "may come into play when 'authority that postdates the original decision, although not directly controlling, nevertheless offers a sound reason for believing that the former panel, in light of fresh developments, would change its collective mind.'" *Id.* (quoting *Williams v. Ashland Eng'g Co.*, 45 F.3d 588, 592 (1st Cir. 1995), *abrogated on other grounds by Carpenters Local Union*, 215 F.3d at 136)). Neither of these narrow exceptions apply here.

First, *Egbert* did not expressly overrule *Bivens* or any of its First Circuit progeny. Egbert's petition for a writ of certiorari squarely offered the Court the opportunity to do so, asking the Court to consider:

1. Whether a cause of action exists under *Bivens* for First Amendment retaliation claims.
2. Whether a cause of action exists under *Bivens* for claims against federal officers engaged in immigration-related functions for allegedly violating a plaintiff's Fourth Amendment rights.
3. Whether the Court should reconsider *Bivens*.

Petition for a Writ of Certiorari at 1, *Egbert v. Boule*, 142 S. Ct. 1793 (2022) (No. 21-147). But the Court declined Egbert's explicit invitation to reconsider *Bivens* and took up only the first two questions. Order, *Egbert v. Boule*, 142 S. Ct. 1793 (2022) (No. 21-147) ("Petition GRANTED limited to Questions 1 and 2 presented by the petition"). The Court reiterated that choice in its majority opinion, which held that it "need not reconsider *Bivens* itself" in order "to decide the case before us." *Egbert*, 142 S. Ct. at 1809.

13

Second, *Egbert*'s clarification that courts may not recognize *new* causes of action under *Bivens* if "there is any reason to think that Congress might be better equipped to *create* a damages remedy" did not call into question the reasoning in *Bivens* or any of its First Circuit progeny regarding causes of action that have *already* been recognized. To the contrary, the Court has emphasized the settlement interests that have long "provide[d] instruction and guidance to federal law enforcement officers" in the original context in which *Bivens* arose. *Abbasi*, 137 S. Ct. at 1856–57. *Egbert*'s analysis within the new context of national and border security presents no conflict with the First Circuit's *Bivens* jurisprudence establishing a cause of action against FBI agents for unreasonable searches during routine investigations. As a result, those cases will remain binding on this Court until or unless the Supreme Court or an *en banc* panel of the First Circuit says otherwise. *See United States v. Bishop,* 453 F.3d 30, 31 (1st Cir. 2006) (the district court was "bound to . . . the law of the circuit"); *Island View Residential Treatment Ctr., Inc. v. Bluecross Blueshield of Mass., Inc.*, No. 07-cv-10581-DPW, 2007 WL 4589335, at *19 n.15 (D. Mass. Dec. 28, 2007) ("A District Court . . . is bound to apply the law of its circuit at the time it is called upon to address an issue").

## CONCLUSION

This Court should deny Osmanski's motion to dismiss.

[*signature block on next page*]

14

          Respectfully submitted,

          AMERICAN CIVIL LIBERTIES UNION
            OF MASSACHUSETTS, INC.

          By its attorneys,

          */s/ Matthew R. Segal*
          Matthew R. Segal, BBO #654489
          Jessie J. Rossman, BBO #670685
          AMERICAN CIVIL LIBERTIES UNION
            FOUNDATION OF MASSACHUSETTS, INC.
          1 Center Plaza
          Boston, MA 02108
          (617) 482-3170
          msegal@aclum.org

November 4, 2022

## **CERTIFICATE OF SERVICE**

      I hereby certify that on November 4, 2022, a true copy of the above document was filed via the Court's CM/ECF system and that a copy will be sent automatically to all counsel of record.

November 4, 2022                                        */s/ Matthew R. Segal*
                                                                Matthew R. Segal