UNITED STATES OF AMERICA
DISTRICT COURT FOR THE DISTRICT OF MASSACHUSETTS

DOCKET NO. 4:22-cv-11152-NMG

| | |
|---|---|
| KORLUH KENNEDY, | ) |
| | ) |
|     Plaintiff | ) |
| | ) |
| v. | ) |
| | ) |
| SPECIAL AGENT JOSEPH F. OSMANSKI, III, | ) |
| SPECIAL AGENT, JOHN DOE 1, | ) |
| TROOPER SGT. DARLENE DECAIRE, TROOPER | ) |
| ERIC KARLON, TROOPER THIAGO MIRANDA | ) |
| JOHN DOE 1-2, A TASK FORCE DETECTIVE | ) |
| EMPLOYED BY THE WORCESTER POLICE | ) |
| DEPARTMENT, JOHN DOE 3-4 WORCESTER | ) |
| POLICE OFFICERS AND JOHN DOE 5 A TASK | ) |
| FORCE OFFICER EMPLOYED BY THE | ) |
| MIDDLESEX COUNTY SHERRIF'S OFFICE | ) |
| THE UNITED STATES OF AMERICA, | ) |
| | ) |
|     Defendants | ) |

<u>FIRST AMENDED COMPLAINT AND DEMAND FOR JURY  TRIAL</u>

**INTRODUCTION**

1. This is an action in civil rights and tort to recover for injuries officers of the FBI, state police, Worcester police officers, a member of the Middlesex County Sheriff's Office caused when they recklessly invaded and wrecked Plaintiff Korluh Kennedy's Cohasset Street home in Worcester, in a warrantless search early on the morning of April 10, 2019.

2. The officers had a warrant to arrest the Plaintiffs son, who they knew did not live there. They roused her from bed by banging loudly on her door and when she opened it forced their way inside brandishing guns and leading two police dogs, one of which urinated on her belongings as officers trashed the apartment.

3. The officers left after about half an hour, when Mrs. Kennedy learned they had no search warrant and warned them she would be calling a lawyer.  They did not identify themselves but one left a phone number with which she was able to identify a joint task force of the Massachusetts State Police Department Violent Fugitive Apprehension Unit ("VAU") and later the presence of other officers from the Worcester Police Department ("WPD"), the Middlesex County Sheriff's Office, and the identity of a special agent from the Federal Bureau of Investigations ("FBI").

## JURISDICTION & VENUE

4.  Mrs. Kennedy brings claims against all the officers for violations of her right to be free from unreasonable search and seizure under Article XIV of the Massachusetts Declaration of rights and under the Fourth Amendment to the U.S, constitution.  The federal claims against state, county, and local officers are actionable under 42 U.S.C. § · 1983, while the FBI agents are sued pursuant to *Bivens v. Six Unknown Fed. Narcotics Agents,* 403 U.S. 388 (1971).  Plaintiff also brings claims against each officer for trespass, invasion of privacy, conspiracy, assault, and intentional infliction of emotional distress as well as for violations of the Massachusetts Civil Rights Act. She sues the United States under the Federal Tort Claims Act for negligence of one or more FBI agents.

5.  This Honorable Court has jurisdiction of the federal claims pursuant to Title 28 U.S.C. §§ 1331, 1343 and 1346, and the Court supplemental jurisdiction of the state law claims pursuant to 28 U.S.C. § 1367.

## PARTIES

6.  Plaintiff Korluh Kennedy ("Mrs. Kennedy") resides and resided at all time material to the complaint at 184 Cohasett Street, Worcester, Worcester County, Massachusetts.  ·

7.  Special Agent Joseph F. Osmanski, III, ("S.A. Osmanski") was at all pertinent times a duly sworn agent of the FBI in Boston Suffolk County, Massachusetts. He has a usual place of residential abode in Bristol County, Massachusetts.

8.  Special Agent John Doe 1, ("S.A. Doe 1"), was at all pertinent times a duly sworn agent with the Federal Bureau of Investigations in Boston, Suffolk County, Mf1-ssachusetts. He has a usual place of business in Suffolk County,  Massachusetts.

9.  Defendant Retired Sgt Darlene K. Decaire ("Sgt. Decaire") was at all pertinent times a duly sworn Trooper with the Massachusetts State Police. She has a usual lace of residential abode at Worcester County, Massachusetts.

10.  Defendant Erik C. Karlon ("Trooper Karlon") was at all pertinent times a duly sworn Trooper with the Massachusetts State Police.  He has a usual place of residential abode at Middlesex County, Massachusetts.

11.  Defendant, Thiago O. Miranda, ("Trooper Miranda") was at all pertinent times a·duly sworn Trooper with the Massachusetts State Police. He has a usual place of residential address at Hampden County, Massachusetts.

12.  Defendants Detectives John Doe 1-2 ("Detective Does 1-2") were at all pertinent times duly sworn officers of the WPD. They have a usual business address at 9-11 Lincoln Street, Worcester, Worcester County, Massachusetts.

13.   Defendants Detective John Doe 3-4 ("Detective Does 13-4") were at all pertinent times duly sworn officers of the WPD employed in the WPD K-9 unit. They have a usual business address at 9-11 Lincoln Street, Worcester, Worcester County, Massachusetts.

14.   Defendant John Doe 5 was at all times material to this complaint a duly sworn police officer with the Middlesex County Sheriff's Department Upon information and belief he resides in Middlesex County, Massachusetts.

15.   The United States of America is a sovereign subject to limited liability pursuant to the Federal Tort Claims Act negligence or other torts of its agents, servants, and employees as well as negligence of its agency, the Federal Bureau of Investigation.

16.   Each individual defendant is sued in his/her individual capacity.

**FACTS**

17.   Each of the foregoing paragraphs is incorporated as if fully set forth  herein.

18.   At all pertinent times each individual defendant acted and/or failed to act as set forth herein under color or state oi: federal law.

19.   At all pertinent times each defendant Massachusetts State Troop/r was an employee of the Commonwealth of Massachusetts State Police, an agency within the Massachusetts Executive Office of Public  Safety.

20.   At all times Sgt. Decaire was responsible to exercise authority  and control over his subordinates. He also had a duty to train, supervise, and discipline officers under his command and to hold members of the Violent Fugitive Apprehension Unit accountable for their conduct and adherence to state and federal laws.

21.   At all pertinent times each Massachusetts State Police Defendant was assigned to the State Police Violent Fugitive Apprehension Section of the Massachusetts State Police.

22.   At all pertinent times, Special Agent Osmanski and S.A. Doe 1 were employed by the FBI in Boston, Suffolk County, Massachusetts.

23.   At all pertinent times detectives John Doe 1-2 were assigned to the Vice Squad of the WPD or its narcotics  unit.

24.   Defendants Does 3 and 4 worked for the WPD canine unit and were responsible for handling police canines.

25.   Does 3 and 4 possessed two trained dual-purpose police canines, specifically trained to detect guns, explosives and to track, apprehend and bite civilians and suspects.

26.  As part of tracking and apprehension these canines were trained to attack, bite and hold persons on command in a manner likely to cause bodily injury or severe bodily injury.

27.  The K-9s brought by Doe 3 and 4 were born, raised, and trained in a kennel and was selected as a working dog, primarily based on the traits of aggression and strength.

28.  These canines were trained to track and apprehend suspects by utilizing what is commonly referred to in the canine field as the "bite and hold" technique.

29.  On command, these canines were trained to "bite and hold" which means they immediately bite the targeted person, regardless of threat or level of resistance; it then continues biting to hold the person, and it renews the attack if the person manages to escape, until commanded to release by its handler.

30.  Unlike family pets, police dogs trained to bite and hold, are trained to bite full-mouth, i.e., using the full capacity of the jaws and all 42 teeth, including incisors at the front of the mouth and molars in in the back order to strengthen the hold on a suspect.

31.  Police dogs that bite full-mouth pose a heightened risk of serious injury to persons they apprehend and bite.

32.  Unlike domestic dogs, police K-9s are specifically trained to bite hard and to do so multiple times.

33.  Bites by trained police dogs such as the two canines brought by Doe 3 and 4 were substantially likely to result in serious lacerations and other serious bodily injuries to others who come in contact with them.

34.  Doe 3 and 4 were specifically asked to bring their K-9s by the federal and state defendants for three specific purposes: a) to track Kormah in the event he was inside of his mother's house, b) to bite and hold him in the event he demonstrated any level of resistance and, c) for the dogs to use their powerful scene of smell to conduct a warrantless search of the property Kormah was living or staying at. ·

35.  Defendant Doe# 5 was a task force officer employed by the Middlesex County Sheriff's Office but upon information and belief possibly working for a federal task force.

36.  At all pertinent times each defendant acted under color of law pursuant to the laws of the United States and the Commonwealth of Massachusetts and/or the statutes, ordinances, regulations, policies, customs, practices, and usage of the City of Worcester.

37.  The Massachusetts State Police Violent Fugitive Apprehension Unit ("VFAU") was created to arrest and apprehend violent felons that are wanted in the Commonwealth.

38. Although the tile of the unit VFAU, would lead a prudent person to believe the unit only executes warrants involving violent fugitives, this is hardly the case as many of the arrests they execute include pedestrian crimes committed in the Commonwealth.

39. Members of the VFAU are deployed throughout the state and operate with very little oversight.

40. Upon information and belief this unit has been subject of numerous complaints including but not limited of unreasonable use force, conduct unbecoming, unreasonable searches and seizures or the targeting of residences where their intended targets did not reside.

## The warrantless entry and search of 184 Cohasset Street, Worcester.

41. At all times material to this complaint Mrs. Kennedy was a naturalized citizen of the United States born in Liberia.

42. She had five children, one of which was Augustus B. Kormah.

43. One March 21, 2019, Augustus B. Kormah was driving a car with his friend and was stopped by Mass. State Police Officer Antwan M. Haywood on South Street in Worcester, Massachusetts.

44. He was stopped inside of Worcester City limits for a pedestrian "moving traffic violation."

45. According to Trooper Antwan, the vehicle operated by Kormah, came to a stop directly over the crosswalk instead of behind it.

46. Trooper Antwan asked for the license and for the identification of Mr. Kormah and his passenger.

47. Mr. Kormah's passenger apparently gave the Trooper the identification for a deceased brother.

48. - Kormah's passenger gave the Trooper false information and was subsequently arrested for an outstanding warrant in the Worcester district court for a license suspension.

49. Kormah told the Trooper he knew the passenger from having been incarcerated in the past.

50. Trooper Antwan alleged in a statement of facts submitted to the court in his application for a criminal complaint against Kormah that he requested permission from Kormah to search the car.

51. Trooper Antwan alleged Kormah consented to the search of his car, and during the search he located a small red bag suggestive of Oxycodone.

52.   Tooper Antwan arrested Kormah and charged him with a crosswaik violation, possession of a Class B substance (oxycodone), and had him transported to the police barracks for booking.

53.   Kormah was scheduled for arraignment in the Worcester District Court 4 days later, on March 25, 2019; he did not show up for his arraignment and the court issued a default warrant for his arrest.

54.   Subsequently the state police defendants wre involved in the entry to Mrs. Kennedy's home.

55.   Upon information and belief defendant members of the State Police VFAU began looking for Kormah to arrest him and bring him back to the Worcester district court.

56.   When Kormah was arrested by Trooper Antwan on March 21 he did not live at 184 Cohasset Street in Worcester,  Massachusetts.

57.   All Defendants knew Kormah did not reside, and was not staying at, his mother's  house.

58.   Kormah's March 21, 2019 arrest was exclusively for a non-violent run-of-the mill crime that in no way implicated violation of federal law.

59.   Recently counsel for Mrs. Kennedy learned from State Police investigators of the Mass. State Police Bureau of Professional Standards (BOPS) that their employees (Defendants, Miranda, Karlon and Decaire) had denied initiating the effort to arrest Kormah.

60.   BOPS investigators were told by the state defendants that federal agents apparently became interested in Mr. Kormah at after learning he had been arrested by the State Police and had an outstanding warrant, and they may have recruited members of the State Police YAU and other task force members to join in investigating him.

61.   Upon information and belief, as a result of Kormah's no-show to the Worcester district court, Defendants searched his listed home address and came up empty .handed.

62.   They then decided to try their luck at the home of his mother, Mrs. Kennedy, which was not his home.

63.   The State Police had was a body warrant for Augustus B. Kormah and nothing  else.

64.   The defendants arrived at Mrs. Kormah's home in the early morning hours of April 10, 2019, and set up a perimeter. One of the Worcester police defendants also called a regular WPD police officer to be present at 184 Cohasset Street.

65.   When defendants arrived at Mrs. Kennedy's house they realized that the car used by Augustus· B. Kormah when arrested weeks before was not there.

66.     At approximately 0630 hours (6:30 AM) Mrs. Kennedy was roused from her sleep by loud banging on her front door at 184 Cohasset Street.

67.     When she asked from behind her front door who it was she was told it was the police.

68.     When she opened the door a group of defendants assaulted her by pointing guns at her and at a young mother nearby who was Mrs. Kennedy's tenant and who was nursing an infant.

69.     The pointing of weapons at Plaintiff and her tenant was a use of force.

70.     Mrs. Kennedy was shocked and terrified by the officers pointing guns at her; she thought she was about to die.

71.     When Mrs. Kennedy opened the door the defendants immediately rushed inside of her house without a search warrant and without permission or consent and immediately began searching for Augustus B. Kormah.

72.     There was nothing she could do or say at the time to stop defendants from their illegal entry and search.

73.     Mrs. Kennedy immediately told the defendants her son did not live at her house and was not staying there.

74.     Within minutes of their warrantless entry Defendants converted the illegal search for Augustus B. Kormah into an unlawful, wholesale warrantless search of the entire house from garage to attic, bathrooms, bedrooms, kitchen, boxes, etc.

75.     Defendants had also brought two WPD K-9 officers with their dogs (John Doe's 3-4) that systematically began searching the house.

76.     One of the dogs urinated inside of Mrs. Kennedy's house.

**77.**     The warrantless search of the house was intentional, reckless, illegal and far-reaching, as a compendium of pictures demonstrates, striking at the core values of the Fourth Amendment and the Massachusetts Declaration of Rights. See **Ex. 1.**

78.     No one had shown Mrs. Kennedy a search warrant and thirty-five to forty-five minutes into their warrantless search of her house it occurred to her to ask them if they had a search warrant.

79.     Up until this time none of the defendants had identified themselves to Mrs. Kennedy, no one gave her a business card for her to know what agencies they worked for.

80.     Defendant, Thiago Miranda, who did not disclose his true identity, told Mrs. Kennedy they had no warrant.

81. When Thiago Miranda told her they had no such warrant, Mrs. Kennedy told him she would call her lawyer.

82. Thiago Miranda and his co-defendants stopped the search of Mrs. Kennedy's house, packed up their equipment and left.

83. When Mrs. Kennedy asked Thiago Miranda to give her his contact information, he did not reveal his name or true identity to her or the fact that he worked for the Massachusetts State Police.

84. As a member of the Massachusetts State Police, Miranda had a duty to let her know his full identity.

85. Instead of doing so, he opened a cell phone he carried and allowed Mrs. Kennedy to photograph the telephone number that allegedly belonged to "Tom."

86. The cell phone number that he gave her was a private cell phone registered to Defendant Miranda. See **Ex. 2,** a photo obtained by Mrs. Kormah of Thiago Miranda's phone.

87. There was no compelling necessity or legal justifications for any of the Defendants' actions and no reasonable officer in any of Defendants' position would have acted in the manner that they did.

88. Plaintiff's apartment was left in disastrous condition.

89. No defendant apologized to her

90. Within days of the raid Mrs. Kennedy's counsel contacted the WPD find out if any of its members had been dispatched to 184 Cohasset St.

91. Worcester police records at the time, including the police daily logs, did not connect any members of the WPD to 184 Cohasset Street.

92. On June 1, 2019 counsel for Mrs. Kennedy made a public records request to Col. Kerry Gilpin at the Mass. State Police in Framingham requesting 14 items. **Ex. 3.**

93. Counsel also provided Col. Gilpin with MSP form 340; a civilian complaint against members of the Mass. State Police (also part of Ex. 3).

94. The Internal Affairs Unit of the MSP assigned Lt. Robert Fries around October 10, 2019 to investigate Kennedy's complaint.

95. The State Police did not respond to the public records request within the time provided by the public records law.

96.   On October 28, 2020 co-counsel for Mrs. Kennedy made another public records request to the Massachusetts state police. **Ex. 4.** Because the State Police failed to respond in timely fashion an appeal was made to the Secretary of Public Records who in turn issued an order on Dec. 26, 2020 for the Mass. State Police to produce records. See **Ex. 5.**

97.   No records were produced.

98.   On January 30, 2021, Mrs. Kennedy's counsel made a public records request to the City of Worcester **Ex. 6**.

99.   Worcester replied there were no public records regarding the 184 Cohasset Street raid.

100.  On or about June 16, 2021 Lt. Fries from internal affairs interviewed Mrs. Kennedy about the 184 Cohasset Street incident.

101.  After a brief interview Lt. Fries told Mrs. Kennedy that what had occurred at her house in April 2019 was unacceptable and he would prepare a report.

102.  Shortly thereafter Lt. Fries retired and apparently did not complete the report or investigation.

103.  Mrs. Kennedy's counsel reached out repeatedly to the State Police for an update.

104.  The State Police Office of the Chief General Counsel informed Mrs. Kennedy's lawyers on February 3, 2021 that: "We have made inquiries of Criminal Records, VFAS, MSP Communications, K-9 logs, and DFS. I personally spoke with the current IA investigator (Lt. Scott Holland) to inquire if any reports exist regarding the reported search at that address. I was advised there are no records. Although an IA case is on-going into your client's complaint and interviews conducted, I was told there are no field records. I was advised that this was a federal operation with minimal MSP assistance. Apparently, no reports were generated."

105.  During March 2022 the MSP Office of the Chief General Counsel advised Mrs. Kennedy's counsel, "We continue to research this request. We've reached out to the several units, including VFAS, for records and, although we are running out of places to look, will continue to research for records on this reported entry. I intend on reviewing the IA file myself on Friday to see if there's anything in there (other than the interviews) regarding the existence of field records. If you have any further information, please let me know."

106.  On October 21, 2021 Mrs. Kennedy counsel received notice from Det. Lt. Donald Short of the Office of Professional Integrity & Accountability of the State Police that he had been assigned to the case and was moving forward to bring it to a conclusion.

107. On April 1, 2021 Mrs. Kennedy's counsel first learned via representatives from the Massachusetts State Police Office of Professional Integrity that their investigation was nearly finalized and another important set of facts.

108. At that time Plaintiff's counsel was first informed that an FBI agent, S.A. Joseph Osmaski, was involved int he raid, and for the first time learned of the involvement of Troopers Eric Karlon and Darlene Decarie, as well as two unidentified Worcester police detectives, and two WPD K-9 officers and a deputy from the Middlesex County Sheriff's Department.

109. On October 7, 2022, Mrs. Kennedy's counsel served notice of her claim against the United States under the Federal Tort Claims Act on the FBI at its offices in Washington DC and Chelsea, Massachusetts. **Ex. 7.**

110. On December 7, 2022, a lawyer of the FBI General Counsel's office wrote Mrs. Kennedy's counsel to advise that her claim had been denied. **Ex. 8.**

111. Upon information and belief no one has been disciplined for the illegal entry and search of Mrs. Kennedy's home..

112. As a direct and proximate result of the unconstitutional actions of defendants Mrs. Kennedy was harmed and suffered severe emotional distress.

113. Defendants' actions were intentional and in reckless disregard to the rights of Mrs. Kennedy.

114. Defendants' actions were the moving force behind Mrs. Kennedy's injuries.

## COUNT I
### 42 U.S.C. § 1983 and Violation of Article XIV of the Massachusetts Declaration of Rights
### Defendants' Thiago Miranda, Eric Karlon, Darlene Decaire, John Doe 1-2, John Doe's 3-4 and John Doe 5

115. Each of the foregoing paragraphs is incorporated as if fully set forth herein.

116. The entry into Mrs. Kennedy's house constituted an unreasonable search and seizure of the Plaintiffs home under Article XIV of the Massachusetts Declaration of Rights and the Fom1h Amendment to the United States Constitution.

117. As a direct and proximate result of Defendants violation of his constitutional rights to due process and to be free of unreasonable search and seizure, Mrs. Kennedy's constitutional rights were violated as set forth herein.

## COUNT II
### Violation of Article XIV of the Massachusetts Declaration of Rights and *Bivens* claim for Violation of the Fourth Amendment
### Defendants S.A. Joseph Osmanski and S.A John Doe 1

118.    Each of the foregoing paragraphs is incorporated as if fully set forth herein.

119.    Defendants while acting under color of law entered and search the home of Mrs. Kennedy without any legal right or justification.

120.    The entry into Mrs. Kennedy's house constituted an unreasonable search of the Plaintiffs house under XIV of the Massachusetts Declaration of Rights and under the Fourth Amendment

121.    As a direct and proximate result of Defendants violations of his constitutional rights to due process and to be free of unreasonable search and seizure, Mrs. Kennedy's constitutional rights were violated as set forth herein.

## COUNT III
Trespass - All Defendants

122.    Each of the foregoing paragraphs is incorporated as if fully set forth herein.

123.    The entry of each defendant into Mrs. Kennedy's home constituted a trespass.

124.    Defendants entered Mrs. Kennedy's property intentionally and without justification.

125.    Defendants' entry onto 184 Cohasset Street was unauthorized and an invasion of Mrs. Kennedy's property.

126.    Mrs. Kennedy was harmed as a result of defendants' trespass.

127.    Defendants committed the common law torts of assault and battery against the plaintiff and as a direct and proximate result he sustained the injuries described  above.

## COUNT IV
Invasion of Privacy - All Defendants          .

128.    Each of the foregoing paragraphs is incorporated as if fully set forth herein.

129.    The entry of each defendant into Mrs. Kennedy's home constituted a trespass and an invasion of privacy in violation of G. L. c. 214 §lB

130.    Defendants invaded Mrs. Kennedy's property intentionally and without  justification.

## COUNT V
Conspiracy - All defendants

131.    Each of the foregoing paragraphs is incorporated as if fully set forth herein.

132.    The individual Defendants conspired to commit the wrongs complained of herein in Counts I through IV and VI through VIII.

## COUNT VI
Assault All Defendants

133.   Each of the foregoing paragraphs is incorporated as if fully set forth herein.

134.   Defendants committed the common law torts of assault against Mrs. Kennedy plaintiff and as a direct and proximate result he sustained the injuries described  above.

## COUNT VII
Massachusetts Civil Rights Act, M.G.L. c. 112 § 111M - All defendants

135.   Each of the foregoing paragraphs is incorporated as if fully set forth herein.

136.   These Defendants deprived the plaintiff of his rights under federal and state law by threats, intimidation and coercion, thereby violating the Massachusetts Civil Rights Act.

137.   As a direct and proximate result of the aforesaid unlawful conduct, the plaintiff suffered the injuries described  herein.

## COUNT VIII
Intentional Infliction of Emotional Distress - All Defendants,

138.   · Each of the foregoing paragraphs is incorporated as if fully set forth  herein.

139.   Defendants armed invasion into Mrs. Kennedy's home caused her to experience severe emotional · distress.

140.   By their actions, Defendants subjected Mrs. Kennedy to reprehensible conduct knowingly, intentionally, willfully, purposely, maliciously and with such reckless disregard of the consequences as to display a conscious indifference to the danger of harm and injury.

141.   As a direct result of the intentional conduct of the defendants in this count, Mrs. Kennedy suffered severe emotional distress and great pain of body and mind.

## COUNT IX
Negligence - Federal Tort Claims Act
The United States

143.   Each of the foregoing paragraphs is incorporated as if fully set forth herein.

144.   On April 10, 2019 the FBI defendants were working within the scope of their employment by the United States.

145.   Their conduct in executing an illegal entry and search of Mrs. Kennedy's home was

negligent and grossly negligent and as a direct and proximate result thereof Mrs. Kennedy was harmed as set forth herein.

146.     On October 7, 2022, within two years of learning of FBI involvement in the raid, Mrs. Kennedy's counsel served notice of her claim upon the agency pursuant to the Federal Tort Claims Act. Ex. 9.

147.     As set forth herein, Plaintiff's counsel did not learn of FBI involvement in the raid within two years of the event due to the Commonwealth's failure to respond to repeated public records requests and due to no oversight or lack of diligence on the part of counsel.

148.     The FBI denied the said claim by letter of December 7, 2022, to Plaintiff's Counsel.

149.     Mrs. Kennedy satisfied all conditions precedent to file this negligence action against the United States under the Federal Tort Claims Act.

<u>PRAYER FOR RELIEF</u>

The Plaintiff respectfully requests the Court order the following relief:

1.     All compensatory damages recoverable;
2.     Injunctive Relief;
3.     All punitive damages recoverable;
4.     All attorney's fees, costs and expenses allowable;
5.     That defendants be found jointly and severally liable;
6.     Any and all other relief as the Court deems just and proper

<u>PLAINTIFF DEMANDS A JURY TRIAL AS TO ALL CLAIMS SO TRIABLE</u>

Respectfully submitted,
PLAINTIFF KORLUH
KENNEDY
By her attorneys,

/s/ *Robert A. Scott*
Hector E. Pineiro, BBO # 555315
Robert A. Scott BBO # 648740
Law Office of Hector E. Pineiro, P.C.
807 Main Street
Worcester, MA 01610
T. (508) 770-0600
F. (508) 770-1300
hector@pineirolegal.com
robin@pineirolegal.com

/s/ *Joseph F. Hennessey*
Joseph F. Hennessey, Esq. BBO#669552
Law Offices of Joseph F. Hennessey
807 Main Street
. Worcester, MA 01610 Tel:
508 881-9500
jh@hennesseylaw.net

DATED: February 16, 2023