# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

KORLUH KENNEDY,

*Plaintiff*,

v.

DARLENE DECAIRE, *et al.*,

*Defendants*.

Civil Action No. 22-cv-11152-MRG

## <u>ORDER ON DEFENDANTS'</u>
## <u>MOTIONS FOR SUMMARY JUDGMENT (ECF Nos. 223 & 227)</u>

**GUZMAN, J.**

Korluh Kennedy ("Plaintiff") brings forth this action against Darlene Decaire

("Decaire"), Thiago Miranda ("Miranda"), and the United States (collectively, "Defendants"),[1]

alleging an unreasonable search and seizure in violation of her constitutional and state rights,

trespass, invasion of privacy, civil conspiracy, assault, violations of her civil rights under the

Massachusetts Civil Rights Act, intentional infliction of emotional distress, and negligence.

Pending before the Court are Defendants Decaire and Miranda's Motion for Summary Judgment

[ECF No. 223] and Defendant United States' Motion for Summary Judgment [ECF No. 227].

For the reasons that follow, both motions are **GRANTED IN PART** and **DENIED IN PART**.

---

[1] Plaintiff additionally filed suit against a number of unnamed "John Doe" parties. To the extent any fictitiously named parties remained unidentified at the close of discovery, the claims against them are dismissed. See <u>Figueroa v. Rivera</u>, 147 F.3d 77, 82-83 (1st Cir. 1998) (affirming dismissal of claims against John Doe defendants because plaintiff made no attempt to serve them with the complaint and summary judgment was ripe for resolution); <u>O'Halloran v. Nationstar Mortg., LLC</u>, No. 16-10211-JGD, 2017 WL 374465, at *1 n.1 (D. Mass. Jan. 25, 2017).

I.    **BACKGROUND**

A.  **Relevant Facts**[2]

This lawsuit arises from law enforcement's attempted execution of an arrest warrant for Augustus Kormah ("Kormah" or "Bobo") at the home of his mother, Korluh Kennedy ("Kennedy"), the plaintiff in this case, on April 10, 2019. [ECF No. 77 ("Am. Compl.") ¶ 1; ECF No. 250 ¶¶ 8, 25-26; ECF No. 252 ¶¶ 6-7].

Kennedy lives at 184 Cohasset Street in Worcester, Massachusetts, where she rents portions of her home to tenants. [ECF No. 250 ¶ 8; ECF No. 252 ¶ 10]. On April 10, 2019, Kennedy had two tenants: Veelisa Shelton, who lived in the basement, and Greg Paasewe, who occupied one of the upstairs bedrooms. [ECF No. 250 ¶¶ 21-23]. Kennedy owned a 2013 black Kia Forte from 2018 to 2023. [ECF No. 250 ¶ 18]. The parties offer different accounts of Bobo's connection to the property. Defendants assert that before April 10, 2019, Bobo "was always" at Kennedy's home and sometimes stayed overnight. [Id. ¶¶ 9-9a; ECF No. 252 ¶ 9]. Kennedy does not dispute these averments, but challenges whether 184 Cohasset Street was Bobo's actual address, noting that none of the arrest warrants listed this address and arguing that officers simply presumed he might be there because "it [is] common for people with warrants to stay or hide at their mother's address." [ECF No. 250 ¶¶ 16-16a, 17-17b]. Both parties agree that Bobo drove Kennedy's Kia Forte at times, though Kennedy maintains the vehicle belonged to her. [ECF No. 250 ¶ 18; ECF No. 252 ¶¶ 8a-8c]. Bobo also owned a Honda Accord,[3] which Kennedy

---

[2] The facts are drawn from the parties' statements of material facts and responses. To the extent necessary, the Court will supplement from other materials in the record. Any factual disputes, as well as their materiality, are addressed infra. This opinion references certain facts that were redacted in the parties' public filings but made available to the Court under seal. Upon the Court's inquiry, no party objected to filing this opinion without redactions or under seal.
[3] Kennedy testified that the Honda Accord was registered in her own name. [ECF No. 225-2 at 93:10-95:4].

asserts was the vehicle he was most recently documented by the Massachusetts State Police ("MSP") as driving before the attempted warrant execution. [ECF No. 250 ¶ 19a].

On April 10, 2019, three active warrants existed for Bobo's arrest. [Id. ¶ 11; ECF No. 252 ¶ 5]. The Worcester Superior Court issued the first warrant on March 25, 2019, for charges including assault and battery, assault and battery with a dangerous weapon, and possession of cocaine with intent to distribute. [ECF No. 250 ¶ 12]. The Worcester District Court issued the second and third warrants on March 27, 2019, both for default after Bobo failed to appear on charges related to drug possession, negligent operation of a motor vehicle, and leaving the scene of property damage. [Id. ¶¶ 13-14].

The MSP Violent Fugitive Apprehension Section ("VFAS") investigates and arrests violent fugitives in Massachusetts. [Id. ¶ 3]. VFAS conducts warrant sweeps by collecting outstanding warrants for violent felonies, determining likely addresses for the subjects, and executing the warrants at those locations. [Id. ¶¶ 4-5; ECF No. 252 ¶ 3]. VFAS practice is to look for the warrant subject rather than to search homes, and MSP obtains verbal rather than written consent to enter residences. [ECF No. 250 ¶¶ 7, 32].

In 2019, FBI Special Agent Osmanski was investigating Bobo for white collar offenses and was assigned to the FBI's Worcester Resident Agency. [Id. ¶¶ 1, 10]. Through law enforcement database searches before April 10, 2019, Osmanski identified three Worcester addresses associated with Bobo: 587 Southbridge Street, 1195 Grafton Street, and 184 Cohasset Street. [Id. ¶ 15]. The Worcester Police Department confirmed that Bobo was no longer associated with the Southbridge Street or Grafton Street addresses. [Id. ¶ 16]. The parties give conflicting versions of how the April 10 operation was initiated. Osmanski maintains that information from law enforcement partners indicated Bobo lived with his mother and brother at

184 Cohasset Street, confirmed by an April 2019 database check, and that he learned VFAS planned to execute the warrant and requested to accompany them to interview Bobo. [Id. ¶¶ 16-17, 20]. Kennedy challenges this account, arguing that VFAS only planned to execute the warrant on April 10, 2019, because Osmanski specifically requested them to do so, citing Sergeant Decaire's statement in an Internal Investigatory Report. [Id. ¶ 20a].

Around 6:00 a.m. on April 10, 2019, ten or more officers from multiple agencies—including Osmanski, VFAS officers, Worcester Police Department officers, and Middlesex Sheriff's Office officers—arrived at Kennedy's home to execute the arrest warrant for Bobo. [ECF No. 250 ¶¶ 25-26; ECF No. 252 ¶¶ 6-7]. Among the VFAS officers were Trooper Miranda and Sergeant Decaire, both assigned to the VFAS Central Team. [ECF No. 252 ¶ 2]. When officers arrived, Kennedy's 2013 Kia Forte was in the driveway, leading defendants to believe they had additional reason to expect Bobo would be at the residence. [ECF No. 250 ¶ 28; ECF No. 252 ¶ 8].

The parties offer fundamentally different versions of the officers' entry into Kennedy's home. After hearing banging on her door, Kennedy asked "Who is it?" and was told "Police." She then opened the door "all the way out" and stepped aside, after which four law enforcement officers entered. [ECF No. 252 ¶¶ 12-14]. The parties provide conflicting accounts about which officers were present at the front door and whether Kennedy consented to entry. Osmanski maintains he was stationed at the back right corner of Kennedy's home, in earshot of the front door, and heard no objection from Kennedy or indication over police radio that she denied entry. [ECF No. 250 ¶¶ 30, 33-35; ECF No. 252 ¶¶ 14-15]. Defendants Miranda and Decaire assert that an officer announced over police radio that Kennedy had consented to entry. [ECF No. 250 ¶¶ 37-37b]. Kennedy offers a contrary account, claiming that Osmanski, Decaire, and Miranda were

4

among the first group of officers who entered her home and that she did not have the opportunity to deny consent. [ECF No. 250 ¶¶ 29-29c, 30-30a, 31-31a, 34a, 35a, 37-37b; ECF No. 252 ¶¶ 10-10a, 11, 18-18a, 25a]. Kennedy specifically identified Osmanski as "someone who had been involved in her son's case" and described him as a "tall State Trooper." [ECF No. 252 ¶ 20]. She also recalled a short person who identified himself as Tom and gave her his phone number, as well as a female officer. [Id. ¶ 21; ECF No. 225-2 at 146:21-147:2]. Defendants Miranda and Decaire maintain they entered through the rear sliding door after another officer opened it from inside, while Kennedy insists they led the initial group at the front door. [ECF No. 250 ¶¶ 38-38a].

The parties also present different versions regarding whether officers had their weapons drawn. All parties agree that officers did not verbally threaten Kennedy when entering her home. [Id. ¶¶ 36-36a]. Defendants Miranda and Decaire maintain that each had their gun holstered on their hip throughout their time in Kennedy's home. [Id. ¶¶ 40, 41]. Kennedy alleges to the contrary that officers had their guns drawn and pointed at her before entering and that officers held unholstered guns in her bedroom. [Id. ¶¶ 36a, 39a, 40a-40b, 41a; ECF No. 252 ¶ 24a].

After entering, an officer asked for Bobo, and Kennedy responded, "Bobo does not live here." [ECF No. 252 ¶ 16]. Officers then searched areas where a person could hide, including the garage and Shelton's basement, looking through large U-Haul boxes Kennedy was sending to Africa, under beds, and behind closet doors. [ECF No. 250 ¶ 43; ECF No. 252 ¶ 22]. Miranda observed that the residence appeared "busy" with an appearance of disarray, while Decaire described it as "lived-in," characterizations Kennedy objects to. [ECF No. 252 ¶¶ 26-26a, 27-27a]. The parties offer conflicting testimony about whether officers damaged Kennedy's property. Defendants maintain that law enforcement did not break any of Kennedy's belongings

5

and that neither officer noticed damage to the home. [ECF No. 250 ¶¶ 60, 63; ECF No. 252 ¶¶ 27-28]. Kennedy contradicts this, testifying to damage to both the exterior garage door and an interior door. [ECF No. 250 ¶¶ 60-60a; ECF No. 252 ¶¶ 23-23a].[4] Officers did not seize any items from Kennedy's home. [ECF No. 250 ¶ 62].

Osmanski, Decaire, and Miranda spoke with Kennedy in her bedroom for approximately five minutes. [Id. ¶¶ 44-45]. During this conversation, no one yelled, and Kennedy appeared cooperative. [Id. ¶¶ 46-47]. Kennedy searched her cell phone for Bobo's phone number and confirmed that Bobo had driven her car in recent months. [Id. ¶¶ 48, 50]. The parties hold opposing views about Kennedy's freedom of movement during this conversation. [Id. ¶¶ 49-49a; ECF No. 252 ¶ 24]. While defendants state Kennedy was free to move around, Kennedy maintains she was surrounded by armed officers and felt "scared to death," claiming that officers held unholstered guns in her bedroom. [ECF No. 250 ¶¶ 41a, 49a; ECF No. 252 ¶ 24a]. Before leaving, Miranda gave Kennedy his phone number so she could provide information about Bobo's whereabouts. Kennedy alleges that Miranda told her, "When you talk to Bobo, have him call me because, if he doesn't call me, it's going to be bad for him." [ECF No. 250 ¶¶ 51-51a; ECF No. 225-2 at 168:16-20].

Law enforcement officers left Kennedy's home through the front door promptly after their conversation concluded. [ECF No. 250 ¶ 52]. Osmanski maintains he was in Kennedy's home for approximately six minutes, while Kennedy rejects this timeframe as too short. [Id. ¶¶ 63-63a]. The officers left voluntarily, as Kennedy does not remember telling any officer to leave or denying them permission to be in her home, though she adamantly denies ever verbally consenting to their entry. [Id. ¶¶ 53-54a]. No officer yelled, screamed, or caused Kennedy

---

[4] Kennedy also added that the officers ripped boxes, pulled curtains, and opened drawers. [ECF No. 225-2 at 58:15-59:19].

physical harm while on her property. [Id. ¶¶ 56-58]. At least one K-9 unit from the Worcester

Police Department was present, but no dog attacked or bit Kennedy, nor did any officer threaten

such action. [Id. ¶ 59].

Following the warrant sweep, Kennedy and her tenant Shelton filed a report with the

MSP, claiming officers illegally entered Kennedy's home with guns drawn and "rummage[d]

through [Kennedy's] entire house," essentially ransacking several rooms. [Id. ¶¶ 64-65]. During

discovery in this litigation, however, Shelton testified that Kennedy "told [Shelton] to follow

[Kennedy] and make a story on the police." [Id. ¶ 66]. Shelton further testified that Kennedy

"messed up her own [house]" and told Shelton "to say that the police did it" instead. [Id. ¶ 67].

According to Shelton, the officers "just came, they did a check [for Bobo], and they just left."

[Id. ¶ 67]. Kennedy counters that Shelton's testimony resulted from an ugly falling out between

them, which led Kennedy to evict Shelton. [Id. ¶ 66a].

Kennedy testified that at the time of the incident she was "scared to death" and that since

then, "[i]t's like a nightmare." [Id. ¶ 68]. Kennedy has not sought treatment from a mental health

professional or taken medication for her distress. [Id. ¶¶ 69-71].

**B. Procedural History**

Kennedy filed a complaint on April 8, 2022, in Worcester Superior Court. [ECF No. 1-4

at 5]. On July 18, 2022, the action was removed to this Court. An amended complaint was

subsequently filed on March 7, 2023. [ECF No. 77]. After a prolonged discovery period, the

action was set to be tried in March 2025. Upon review of the parties' pretrial filings, the Court

determined that several dispositive issues remained unresolved. The Court therefore continued

the trial and directed the parties to file dispositive motions. Defendants filed their respective

motions for summary judgment on April 17, 2025 (Defendants Decaire and Miranda) and April

18, 2025 (Defendant United States), along with a statement of material facts and a memorandum in support. [ECF Nos. 223-25, 227-28, 230]. Kennedy subsequently filed her opposition briefs, accompanied by her responses to Defendants' statements of material facts. [ECF Nos. 250, 252]. The Court heard oral argument on the present motion for summary judgment on August 4, 2025.

## II.    <u>LEGAL STANDARDS</u>

Summary judgment is appropriate when there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party must therefore demonstrate that "there is an absence of evidence to support the nonmoving party's case." <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 325 (1986). The burden then shifts "to the nonmovant to establish the existence of at least one fact issue which is both 'genuine' and 'material.'" <u>Garside v. Osco Drug, Inc.</u>, 895 F.2d 46, 48 (1st Cir. 1990) (collecting cases). The nonmovant "must present affirmative evidence in order to defeat a properly supported motion for summary judgment." <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 257 (1986).

A genuine issue exists when the evidence permits "a rational factfinder to resolve the issue in favor of either side." <u>Nat'l Amusements, Inc. v. Town of Dedham</u>, 43 F.3d 731, 735 (1st Cir. 1995). In other words, there must be "sufficient evidence supporting the claimed factual dispute . . . to require a jury or judge to resolve the parties' differing version of the truth at trial." <u>Hahn v. Sargent</u>, 523 F.2d 461, 464 (1st Cir. 1975) (quoting <u>First Nat'l Bank of Ariz. v. Cities Serv. Co.</u>, 391 U.S. 253, 289 (1968)). A material fact is "one that has the potential of affecting the outcome of the case." <u>Calero-Cerezo v. U.S. Dep't of Justice</u>, 355 F.3d 6, 19 (1st Cir. 2004) (citing <u>Anderson</u>, 477 U.S. at 248-50). Summary judgment must be denied "when a disputed fact has the potential to change the outcome of the suit under the governing law if found favorably to the nonmovant[.]" <u>Parrilla-Burgos v. Hernandez-Rivera</u>, 108 F.3d 445, 448 (1st Cir. 1997).

"Local Rule 56.1 was adopted to expedite the process of determining which facts are genuinely in dispute, so that the court may turn quickly to the usually more difficult task of determining whether the disputed issues are material." <u>Butters v. Wells Fargo Advisors, LLC</u>, No. 10-10072-MLW, 2012 WL 5959986, at *1 (D. Mass. Nov. 27, 2012) (quoting <u>Brown v. Armstrong</u>, 957 F. Supp. 1293, 1297 (D. Mass.), <u>aff'd</u>, 129 F.3d 1252 (1st Cir. 1997)). The non-moving party must state the specific facts that are disputed which prevent the granting of summary judgment. <u>Brown</u>, 957 F. Supp. at 1297 (citing <u>Vasapolli v. Rostoff</u>, 864 F. Supp. 215, 218 (D. Mass. 1993), <u>aff'd</u>, 39 F.3d 27 (1st Cir. 1994)). The nonmovant must "go beyond merely asserting the existence of a disputed and material fact[,]" and produce evidence that "substantially proves the existence of such a disputed fact." <u>Lucia v. Prospect St. High Income Portfolio, Inc.</u>, No. 90-10781-MA, 1993 WL 761409, at *5 (D. Mass. Aug. 26, 1993) (citing <u>Sheinkopf v. Stone</u>, 927 F.2d 1259, 1262 (1st Cir. 1991)).

In analyzing motions for summary judgment, all reasonable inferences are drawn in favor of the nonmoving party. <u>Gattineri v. Wynn MA, LLC</u>, 63 F.4th 71, 85 (1st Cir. 2023) (quoting <u>Doe v. Tr. of Bos. Coll.</u>, 892 F.3d 67, 79 (1st Cir. 2018)). Parties may not rely on "conclusory allegations or substantiated denials" and must take facts "derived from the pleadings, depositions, answers to interrogatories, admissions and affidavits to demonstrate either the existence or absence of an issue of fact." <u>Magee v. United States</u>, 121 F.3d 1, 3 (1st Cir. 1997) (citing Fed. R. Civ. P. 56(c) & (e)). In any event, if there is "sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party[,]" the Court will deny the motion. <u>Rochester Ford Sales, Inc. v. Ford Motor Co.</u>, 287 F.3d 32, 38 (1st Cir. 2002) (quoting <u>Anderson</u>, 477 U.S. at 249). Otherwise, the motion should be granted.

### III.    DISCUSSION

### A.    Count I: Unreasonable Search and Seizure (Section 1983 and MDR)

Section 1983 "is a vehicle through which individuals may sue certain persons for depriving them of federally assured rights[.]" Gagliardi v. Sullivan, 513 F.3d 301, 306 (1st Cir. 2008). In order to succeed on a Section 1983 claim, a plaintiff must show that defendants acted under the color of state law, and that his or her conduct deprived plaintiff of rights secured by the Constitution or by federal law. Id. (citing Rodriguez-Cirilo v. Garcia, 115 F.3d 50, 52 (1st Cir. 1997)). Vicarious liability is inapplicable to Section 1983 claims. See Welch v. City of Biddeford Police Dep't, 12 F.4th 70, 75-76 (1st Cir. 2021) ("Officers are not liable under § 1983 for the actions of other officers"). As such, "a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." Ashcroft v. Iqbal, 556 U.S. 662, 676 (2009).

At Count I, Plaintiff alleges that Defendants Miranda and Decaire violated her right to privacy under the Fourth Amendment when they entered into her house and subsequently conducted a search. The Fourth Amendment protects individuals from "unreasonable searches and seizures." U.S. Const. amend. IV. Indeed, the very essence of the Fourth Amendment is the right of a family to retreat into their own home and "there be free from unreasonable governmental intrusion." Florida v. Jardines, 569 U.S. 1, 6 (2013) (quoting Silverman v. United States, 365 U.S. 505, 511 (1961)) ("But when it comes to the Fourth Amendment, the home is first among equals."). However, this protection is not without limits. With some exceptions, the threshold of a home "may not reasonably be crossed without a warrant." Payton v. New York, 445 U.S. 573, 590 (1980); accord Brigham City v. Stuart, 547 U.S. 398, 403 (2006) ("[S]eizures inside a home without a warrant are presumptively unreasonable."). In the instant case, the

parties do not dispute that Defendants possessed a valid warrant to arrest Plaintiff's son.

However, Plaintiff contends that her rights were violated because none of the arrest warrants that

Defendants attempted to execute provided Plaintiff's address. The Court thus faces the task of

determining whether Defendants Miranda and Decaire's entry into Plaintiff's residence was

nevertheless lawful, and whether the subsequent warrantless search was unreasonable in

violation of her constitutional and statutory rights.

### 1.    *Illegal Entry*

We begin with the entry into Plaintiff's residence. Defendants Miranda and Decaire

contend that they are entitled to summary judgment because, to the extent there was a violation

of Plaintiff's rights, they did not deliberately deprive Plaintiff of her constitutional and statutory

rights. [ECF No. 224 at 9-10]. Specifically, they maintain that they were initially located at the

perimeter of Plaintiff's residence to prevent her son from fleeing, and only entered the house

after being informed over radio that they were clear to enter. [ECF No. 252 ¶¶ 10, 25]. While in

certain circumstances, "merely negligent conduct may not be enough to state a [Section 1983]

claim," Daniels v. Williams, 474 U.S. 327, 329-30 (1986), Plaintiff disputes Defendants Miranda

and Decaire's account, expressly identifying both as being among the first group of law

enforcement officers who entered her residence, [ECF No. 244 ¶ 10a]. Miranda and Decaire

retort that this dispute is immaterial, asserting that regardless of their location at the time the first

group of law enforcement officers entered Plaintiff's residence, their conduct was reasonable

under the circumstances and, in any event, Plaintiff consented to the entry. [ECF No. 260 at 1-3].

The Court agrees, albeit for slightly different reasons.

It is well-settled law that "an arrest warrant founded on probable cause implicitly carries

with it the limited authority to enter a dwelling in which the suspect lives when there is reason to

believe the suspect is within." Payton, 445 U.S. at 603. In Payton, the Supreme Court established a two-pronged inquiry that requires courts to determine whether the law enforcement officers had a sufficient basis to believe that (i) the suspect lived at the residence in question and (ii) was present at the time of their entry. United States v. Werra, 638 F.3d 326, 337 (1st Cir. 2011) (citing Payton, 445 U.S. at 603). The First Circuit has implicitly accepted the majority view requiring officers to only possess a "reasonable belief" instead of the more demanding "probable cause" standard. United States v. Young, 835 F.3d 13, 19 n.6 (1st Cir. 2016) (quoting Werra, 638 F.3d at 337); see also United States v. Hamilton, 819 F.3d 503, 506 n.5 (1st Cir. 2016). Moreover, the officers' reasonable belief as to the first prong can properly inform the analysis of the second prong. Harris v. Norris, No. 13-12275-FDS, 2015 WL 2450921, at *8 (D. Mass. May 22, 2015) ("[I]f officers have strong or overwhelming evidence that a suspect lives at a particular location, the quantum of evidence required to justify their belief that she is present at a particular time may be reduced.").

Turning to the first prong of the analysis, we inquire if Defendants Miranda and Decaire had a reasonable belief that Kormah lived in Plaintiff's residence. As an initial matter, it is undisputed that Kormah was the subject of three outstanding arrest warrants. [ECF No. 250 ¶ 11]. Plaintiff insists that none of the warrants provided her address, [id. ¶ 16a], but the validity of the warrants is not before the Court, and her argument entirely fails to address the relevant inquiry. Indeed, it is undisputed that, based on information known to the officers before April 10, 2019, including from searches of law enforcement databases, Kormah was associated with three addresses in Worcester, including Plaintiff's address. [Id. ¶ 15]. Following additional investigation, Defendants learned that Kormah was no longer affiliated with two of the addresses, leaving Plaintiff's address as the only likely option. [Id. ¶ 16]. A subsequent inquiry in

April 2019—mere days before the warrant sweep—confirmed that Kormah was associated with Plaintiff's address. [Id. ¶¶ 16-17]. Although Plaintiff disputes these allegations, pointing to the contents of the arrest warrants, she does nothing to contravene the information obtained by law enforcement officers. See Anderson, 477 U.S. at 257. There is therefore no genuine dispute of material fact. In fact, Plaintiff testified at her deposition that Kormah was always at her house, spending the night once in a while. [ECF No. 225 ¶ 9]. Construing the facts in Plaintiff's favor, while it may be entirely possible that Kormah was affiliated with other addresses, it was entirely reasonable for Defendants Miranda and Decaire to believe Kormah lived in Plaintiff's address based on the information that was gathered in preparation to the execution of the warrants, including multiple searches on law enforcement databases. See Werra, 638 F.3d at 337; Young, 835 F.3d at 19 n.6.

Moreover, in addition to Kormah's association with Plaintiff's address, law enforcement considered the vehicles he typically drove. Most significantly, Plaintiff owned a 2013 black Kia Forte that she conceded Kormah drove multiple times, including prior to April 10, 2019. [ECF No. 229 ¶ 18; ECF No. 225-2 at 258:22-259:12]. Information gathered by law enforcement confirmed that Kormah had been known to operate Plaintiff's vehicle. [ECF No. 230-2 at 7; ECF No. 230-4 at 4; ECF No. 246 ¶ 18]. Because the same vehicle was parked in Plaintiff's driveway on April 10, 2019, [ECF No. 252 ¶¶ 8-8a], it was entirely reasonable for Defendants to believe that Kormah lived with Plaintiff, and that he might be present too, see Werra, 638 F.3d at 337; Young, 835 F.3d at 19 n.6.

However, while Plaintiff does not dispute the information relied upon by law enforcement, she takes issue with the fact Defendants allegedly knew that Kormah was also known to own and drive a Honda Accord that was registered in Plaintiff's name. [ECF No. 250 ¶

19a; ECF No. 225-2 at 93:10-95:4]. According to Plaintiff, the Honda Accord was "the vehicle he was most recently document driving in a MSP report dates less than three weeks prior on March 22, 2019." [ECF No. 250 ¶ 19a]. Although the documents Plaintiff cites fail to support her contention, [ECF No. 225-3 at 42:21-43:9; ECF No. 225-4 at 13:3-16], a review of the record shows that in March 2019, mere weeks before the events in question, Kormah was involved in a motor vehicle stop while driving the Honda Accord, [ECF No. 225-2 at 94:1-13]. Even accounting for this fact, the substantial body of undisputed evidence shows that Defendants' belief that Kormah lived at Plaintiff's residence was reasonable. The crux of the matter thus turns on whether despite this information, law enforcement had a reasonable belief that Kormah would be present.

In the Court's opinion, the second prong of the analysis is also met. The information gathered by law enforcement pointed to Plaintiff's residence, showed that Kormah drove Plaintiff's vehicle on multiple occasions, and that the same vehicle was parked in Plaintiff's driveway. That body of evidence leads nowhere but to, at least, a reasonable belief that Kormah would be present on August 10, 2019. Even if Defendants had knowledge that Kormah owned and drove a different vehicle, "[t]he fact that an individual is known to live at a particular location is one sound reason to expect him or her to be there." Werra, 638 F.3d at 340; accord Hamilton, 819 F.3d at 508 ("But as it was reasonable to believe that [the suspect] lived at [the residence], it was reasonable for police to believe that he would be home[.]"); 3 Wayne R. LaFave, Search & Seizure § 6.1(a) (6th ed.) ("[T]he police need not possess 'special knowledge' that the defendant is at home . . . , for in the absence of facts tending to show that the defendant is not at home it is reasonable to infer that he would be there"). That is to say, even construing Plaintiff's allegations in her favor, they cannot disturb the undisputed body of evidence

establishing Defendants' reasonable belief. Accordingly, summary judgment is appropriate in Defendants Miranda's and Decaire's favor as the claim relates to the entry into Plaintiff's residence.

### 2. *Unreasonable Search*

Next, Plaintiff contends that Defendants' search of her residence violated her Fourth Amendment rights because it was overbroad in scope. Although an arrest warrant permits law enforcement to enter a residence under certain circumstances, it does not give law enforcement license to engage in acts "unrelated to the objectives of the authorized intrusion." Arizona v. Hicks, 480 U.S. 321, 325 (1987). Defendants Miranda and Decaire argue that the search was lawful because Plaintiff gave her consent. [ECF No. 224 at 10; ECF No. 225 ¶¶ 12-15, 19-24; ECF No. 231 ¶¶ 32-43]. A search conducted pursuant to voluntarily obtained consent is a well-recognized exception to the Fourth Amendment's warrant requirement. Schneckloth v. Bustamonte, 412 U.S. 218, 219 (1973); United States v. Winston, 444 F.3d 115, 121 (1st Cir. 2006). A warrantless search may not, however, exceed the scope of the consent granted. United States v. Marshall, 348 F.3d 281, 286 (1st Cir. 2003). "The scope of consent is measured by a test of objective reasonableness: 'what would the typical reasonable person have understood by the exchange between the officer and subject?'" Id. (quoting Florida v. Jimeno, 500 U.S. 248, 251 (1991)). "[Courts] therefore look beyond the language of the consent itself, to the overall context, which necessarily encompasses contemporaneous police statements and actions." Id. at 286-87; see also United States v. Casellas-Toro, 807 F.3d 380, 391 (1st Cir. 2015).

Here, although the officers lawfully entered the residence based on their reasonable belief that Kormah lived there and would be present, this authority did not extend to activities beyond the scope of the authorized entry. As it relates to the subsequent search, genuine issues of

material fact preclude summary judgment on whether Plaintiff voluntarily consented. In her deposition, the Plaintiff testified that armed officers surrounded her in her home, leaving her "scared to death." [ECF No. 244 ¶¶ 23a, 24a, 26a, 27a; ECF No. 246 ¶¶ 49a, 54a, 55a]. Additionally, questions remain about whether the search exceeded its proper scope, which is necessarily informed by the consent given. While the officers were conducting a warrant sweep with the primary goal of arresting Kormah, the evidence presents conflicting narratives about their conduct. The record confirms that officers searched locations where Kormah could reasonably hide, such as under beds and behind closet doors. [ECF No. 244 ¶¶ 22-23; ECF No. 246 ¶¶ 42-43]. However, the officers also searched inside boxes, and Plaintiff alleges they left her home in disarray. [ECF No. 244 ¶¶ 22, 23, 23a, 26a, 27a-b; ECF No. 225-2 at 58:15-59:19 (testifying that officers ripped open a box, pulled blinds apart, opened kitchen drawers, etc.)]. These facts suggest the officers may have exceeded the bounds of searching places where an adult such as Kormah could conceal himself. Given these disputed material facts, summary judgment on the search must be denied.

### 3.    *Article 14 of the Massachusetts Declaration of Rights*

At Count I, Plaintiff claims that "[t]he entry into Mrs. Kennedy's house constituted an unreasonable search and seizure of the Plaintiff[']s home under Article XIV of the Massachusetts Declaration of Rights[.]" [Am. Compl. ¶ 116]. Article 14 of the Massachusetts Declaration of Rights ("MDR") provides, among other things, "a right to be secure from all unreasonable . . . seizures." Mass. Const. pt. 1, art. XIV. The Massachusetts Supreme Judicial Court "has never held that there is a right of action to enforce the Declaration of Rights," although "[i]t did suggest, 35 years ago, in dicta, that such a right 'may' be available." Pimentel v. City of Methuen, 323 F. Supp. 3d 255, 273 (D. Mass. 2018) (citing Phillips v. Youth Dev.

Program, Inc., 459 N.E.2d 453, 457 (Mass. 1983); Layne v. Superintendent, Mass. Corr. Inst.,

Cedar Junction, 546 N.E.2d 166, 169 (Mass. 1989)). That said, "no Massachusetts appellate

court, in the time since, has ever held that such a right exists under Article 14." Bird v. City of

New Bedford, No. 17-cv-12159, 2019 WL 4394914, at *8 (D. Mass. Sept. 13, 2019). Because

"[i]t is up to the courts of Massachusetts, not this Court, to make that choice," id. (quoting

Pimentel, 323 F. Supp. 3d at 273), and because no further discovery or argument from Plaintiff

will change the state of the law, see Tucard, LLC v. Fid. Nat'l Prop. & Cas. Ins. Co., 567 F.

Supp. 2d 215, 222 (D. Mass. 2008), the motion for summary judgment as to the claim for

violations of the MDR must be granted, Kendall v. Doe, No. 21-CV-10711-ADB, 2024 WL

5187697, at *8 (D. Mass. Dec. 19, 2024). To the extent that Plaintiff is asserting a claim under

the Massachusetts Civil Rights Act, Mass. Gen. Laws ch. 12, § 11I, that claim will be addressed

in due course.

### 4.    *Qualified Immunity*

Defendants maintain they are qualifiedly immune from liability. The qualified immunity

doctrine protects public officials, in their individual capacity, "when a reasonable decision in the

line of duty ends up being a bad guess—in other words, it shields from liability 'all but the plainly

incompetent or those who knowingly violate the law.'" Belsito Commc'ns, Inc. v. Decker, 845

F.3d 13, 22-24 (1st Cir. 2016) (quoting Taylor v. Barkes, 575 U.S. 822, 825 (2015)). To establish

whether government officials are entitled to qualified immunity, the Court must engage in a "two-

pronged inquiry." Tolan v. Cotton, 572 U.S. 650, 655-56 (2014). The Court must determine: (1)

whether the facts that a plaintiff has alleged or shown make out a violation of a constitutional right,

and (2) whether the right in question was "clearly established" at the time of defendant's alleged

misconduct. See id. "The plaintiff bears the burden of demonstrating that the law was clearly

established at the time of the alleged violation, and it is a heavy burden indeed." Lachance v. Town of Charlton, 990 F.3d 14, 20 (1st Cir. 2021) (quoting Mitchell v. Miller, 790 F.3d 73, 77 (1st Cir. 2015)). Determining whether a right is "clearly established" also requires a two-part inquiry. See Justiniano v. Walker, 986 F.3d 11, 26 (1st Cir. 2021). First, the law defining the "contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right" at the time of the alleged constitutional violation. Maldonado v. Fontanes, 568 F.3d 263, 269 (1st Cir. 2009) (quoting Anderson v. Creighton, 483 U.S. 635, 640 (1987)). And second, in the factual context of the case, a reasonable defendant would have to understand that his conduct violated the plaintiff's constitutional rights. Fontanes, 568 F.3d at 269. To demonstrate that the law was clearly established, a plaintiff may rely on "controlling authority" or a "robust consensus of cases of persuasive authority," the latter which may be satisfied by sister circuit case law, as a "robust consensus" does not necessarily "require the express agreement of every circuit." Irish v. Fowler, 979 F.3d 65, 76-77 (1st Cir. 2020) (citing District of Columbia v. Wesby, 583 U.S. 48, 63 (2018); Wilson v. Layne, 526 U.S. 603, 616-18 (1999)). Although a case "need not arise on identical facts, it must be sufficiently analogous to make pellucid to an objectively reasonable officer the unlawfulness of his actions." Gray v. Cummings, 917 F.3d 1, 10 (1st Cir. 2019).

The Court recognizes the challenges posed by deciding qualified immunity at the summary judgment stage. Indeed, because qualified immunity is an immunity from suit, it is "effectively lost" if permitted to proceed to trial. Pearson v. Callahan, 555 U.S. 223, 231 (2009). As such, the application of the immunity should be resolved at the earliest stage of litigation, which typically occurs on a motion for summary judgment. Fontanes, 568 F.3d at 268; Justiniano, 986 F.3d at 27. The intersection of qualified immunity principles and summary judgment principles presents "thorny analytic[al] problems," including "a tug-of-war . . . between who gets the benefit of the

doubt: summary judgment requires absolute deference to the nonmovant's factual assertions, while qualified immunity demands deference to the reasonable, if mistaken, actions of the movant." Justiniano, 986 F.3d at 27 (citation modified). Therefore, the court must "identify the version of events that best comports with the summary judgment standard and then ask whether, given that set of facts, a reasonable officer should have known that his actions were unlawful." Penate v. Sullivan, 73 F.4th 10, 17 (1st Cir. 2023) (quoting Morelli v. Webster, 552 F.3d 12, 19 (1st Cir. 2009)).

As discussed above, there are genuine disputes of material fact preventing the Court from evaluating whether Defendants Miranda and Decaire violated Plaintiff's Fourth Amendment rights. Even assuming that Plaintiff's rights were violated, thereby satisfying the first element of the qualified immunity analysis, the same factual disputes preclude the Court from making a determination as to the second element. There is little question that absent consent or exigent circumstances, a warrantless search of the home is presumptively unconstitutional. Payton, 445 U.S. at 586-88; Groh v. Ramirez, 540 U.S. 551, 564 (2004); DeMayo v. Nugent, 517 F.3d 11, 15 (1st Cir. 2008). And, when consent to a search is involved, a warrantless search cannot exceed the scope of the consent given. Marshall, 348 F.3d at 286. As such, whether or not a reasonable officer would have understood under the circumstances that Defendants Miranda's and Decaire's actions violated this right is a fact-intensive question. It involves understanding what they knew as they entered the residence, the nature of their interaction with Plaintiff and her response to that interaction, as well as what transpired during the search. See id. at 286-87; Casellas-Toro, 807 F.3d at 391. These are questions that require input from a factfinder, and until they answered, the Court is unable to evaluate whether Defendants Miranda's and Decaire's conduct was, as a matter of law, so deficient that "a reasonable official would understand that what [they were] doing

violate[d] [Plaintiff's] right[s]." <u>Fontanes</u>, 568 F.3d at 269; <u>see</u> <u>Fernandez-Salicrup v. Figueroa-Sancha</u>, 790 F.3d 312, 326 (1st Cir. 2015); <u>Hourihan v. Bitinas</u>, No. 16-CV-11734-ADB, 2018 WL 10246994, at *7 (D. Mass. June 27, 2018), <u>aff'd,</u> 811 F. App'x 11 (1st Cir. 2020). Accordingly, Plaintiff's Fourth Amendment claim as it relates to the search of her residence may proceed to trial on those limited grounds, and Defendants Miranda and Decaire's qualified immunity defense may be raised again at trial. <u>Roach v. Green</u>, No. CV 14-13515-RGS, 2016 WL 1254236, at *5 (D. Mass. Mar. 29, 2016).

**B.    <u>Count VII: MCRA</u>**

At Count VII, Plaintiff maintains that Defendants deprived her of her rights under federal and state law in violation of Mass. Gen. Laws Ch. 12, § 11I, the state analog to Section 1983. The Massachusetts Civil Rights Act ("MCRA") creates a private action in which individuals may recover for constitutional violations regardless of whether they acted under the color of law. Mass. Gen. Laws ch. 12, § 11I; <u>see</u> <u>Sena v. Commonwealth</u>, 629 N.E.2d 986, 993 (Mass. 1994). To state a viable MCRA claim, a plaintiff must demonstrate that "(1) the exercise or enjoyment of some constitutional or statutory right; (2) has been interfered with, or attempted to be interfered with; and (3) such interference was by threats, intimidation, or coercion." <u>Barron v. Kolenda</u>, 203 N.E.3d 1125, 1139-40 (Mass. 2023) (quoting <u>Glovsky v. Roche Bros. Supermarkets, Inc.</u>, 17 N.E.3d 1026, 1035 (Mass. 2014)).

Under the MCRA,

threat consists of the intentional exertion of pressure to make another fearful or apprehensive of injury or harm; intimidation involves putting in fear for the purpose of compelling or deterring conduct; and coercion is the application to another of such force, either physical or moral, as to constrain him to do against his will something he would not otherwise have done.

20

Glovsky, 17 N.E.3d at 1035 (cleaned up) (quoting Haufler v. Zotos, 845 N.E.2d 322, 335 (Mass.

2006)). "A direct violation of a person's rights does not by itself involve threats, intimidation, or

coercion." Longval v. Comm'r of Corr., 535 N.E.2d 588, 593 (Mass. 1989); accord Santiago v.

Keyes, 890 F. Supp. 2d 149, 155 (D. Mass. 2012) ("[T]he constitutional violation itself cannot

also serve as the prerequisite 'threats, intimidation, or coercion' under the MCRA."). Rather, to

be actionable, a defendant's actions must amount to "an attempt to force someone to do

something the person is not lawfully required to do." Farrah v. Gondella, 725 F. Supp. 2d 238,

248 (D. Mass. 2010) (quoting Freeman v. Planning Bd. of W. Boylston, 646 N.E.2d 139, 149

(Mass. 1995)).

 Consistent with the Court's findings supra, the only predicate constitutional violation is

the warrantless search of Plaintiff's residence. To the extent Plaintiff's MCRA claim is based on

the allegation that Defendants had their guns drawn, [ECF No. 245 at 4], her claim fails as a

matter of law. Executing an arrest or search warrant by force is intrinsically coercive. See, e.g.,

Penate, 73 F.4th at 20-21 (explaining that police officers may use reasonable force when

executing a search warrant); Bissereth v. United States, No. 21-cv-11068-ADB, 2023 WL

4373888, at *10 (D. Mass. July 6, 2023) ("[L]aw enforcement personnel are authorized to use

reasonable force, and no more, to execute warrants and carry out lawful orders."). Because a

direct violation of a right—here, the unlawful search of Plaintiff's residence—cannot itself

satisfy the coercion requirement, Longval, 535 N.E.2d at 593; Santiago, 890 F. Supp. 2d at 155,

Plaintiff must point to "some allegation that the [Defendants'] conduct was intended to coerce

[her] into refraining from the exercise of a right or privilege secured by law," Mercurio v. Town

of Sherborn, 287 F. Supp. 3d 109, 123 (D. Mass. 2017) (quoting Barbosa v. Conlon, 962 F.

Supp. 2d 316, 332 (D. Mass. 2013)). Although Plaintiff maintains that the officers were armed

and had their guns drawn throughout the interaction, [ECF No. 244 ¶¶ 23a, 24a, 26a, 27a; ECF No. 246 ¶¶ 49a, 54a, 55a], she fails to provide any evidence showing that Defendants used their weapons or acted in any way intended to coerce her into giving up her constitutional right to be free from unreasonable searches. Cf. Morse v. Commonwealth of Mass. Exec. Off. of Pub. Safety Dep't of State Police, 123 F. Supp. 3d 179, 195 (D. Mass. 2015) (denying summary judgment on MCRA claim where officers announced that if suspect did not exit home and surrender to arrest, they would forcibly enter); Miller v. Pugliese, 693 F. Supp. 3d 163, 180 (D. Mass. 2023) (finding sufficient evidence for MCRA to survive summary judgment where officer threatened to break down suspect's door or to call the fire department to force into his home after suspect barricaded himself in home following attempted traffic stop). Accordingly, summary judgment must be granted in Defendants' favor.

### C.    Count III: Trespass

Plaintiff claims that Defendants' entry into her residence constituted a trespass. [Am. Compl. ¶¶ 122-27]. To state a claim for trespass, a plaintiff must show defendant intentionally and illegally entered onto property over which he had actual possession. New Eng. Box Co. v. C & R Constr. Co., 49 N.E.2d 121, 128 (Mass. 1943). The parties do not dispute that Plaintiff had actual possession of the property. As such, the principal question before the Court is the legality of Defendants' entry into the residence. "When law enforcement officers enter a plaintiff's land pursuant to a valid warrant and do not exceed the warrant's scope, they do not commit trespass." Gill v. United States, 588 F. Supp. 3d 134, 138 (D. Mass. 2022). Conversely, when the warrant authorizing that entry is invalid, such unlawful entry is tortious. Id.

As an initial matter, Defendants Miranda and Decaire argue that they did not intentionally enter Plaintiff's residence without her consent, explaining that they only entered after receiving a

radio call indicating that they were clear to enter. [ECF No. 224 at 15-16]. This argument is

without merit. Trespass is an intentional tort, requiring a plaintiff to prove an "affirmative

voluntary act" by the defendant. United Elec. Light Co. v. Deliso Constr. Co., 52 N.E.2d 553,

556 (Mass. 1943). It is undisputed that Defendants Miranda and Decaire entered Plaintiff's

residence. The fact that they relied on the radio communication as confirmation they could enter,

and perhaps under the assumption that Plaintiff had given her consent, is of no consequence, as it

is not necessary that a trespasser know that their invasion violates the right of possession of the

plaintiff. Bernier v. Fredette, No. 08 MISC 382371(GHP), 2012 WL 2873988, at *10 (Mass.

Land Ct. July 16, 2012) ("Trespass, thought it involves a voluntary act, may occur without

design, without actual intent to invade, as 'from an intrusion by mistake[.]'"), aff'd, 8 N.E.3d

769, 773 (Mass. App. Ct. 2014).

       The United States, however, maintains that making an arrest carries with it the privilege

to enter a property without committing a trespass. [ECF No. 228 at 6-7]. We agree. Because

entry into Plaintiff's residence was proper, authorized by an arrest warrant, and supported by

reasonable belief that Kormah lived there and would be present, see supra, Defendants cannot be

liable for trespass. See Diaz v. Devlin, No. CV 16-40039-TSH, 2019 WL 4804803, at *8 (D.

Mass. Sept. 30, 2019) ("Because entry into the residence was proper and authorized by the

search warrant, Defendants were entitled to rely upon the search warrant in this case."). The

Court will therefore enter summary judgment in Defendants' favor.

    **D.**   **Count VI: Assault**

       Plaintiff claims that Defendants committed assault alleging that they came into her home

with their guns drawn. [Am. Compl. ¶¶ 68-69, 133-34]. Under Massachusetts law, an assault

requires the plaintiff to demonstrate that the defendant "acted intending to cause a harmful or

offensive contact with plaintiff, or an imminent apprehension of such a contact, and that plaintiff was thereby put in such imminent apprehension." Kennedy v. Town of Billerica, 617 F.3d 520, 538 (1st Cir. 2010) (internal quotations omitted) (quoting Restatement (Second) of Torts § 21(1) (1965); Conley v. Romeri, 806 N.E.2d 933, 939 n.6 (Mass. App. Ct. 2004)). "However, Massachusetts law also allows an officer to use reasonable force in conducting a lawful arrest," and therefore "reasonable force is a valid defense to assault[.]" Raiche v. Pietroski, 623 F.3d 30, 40 (1st Cir. 2010).

Defendants Miranda and Decaire argue that summary judgment is appropriate because, while they were armed on the day in question, they never unholstered or displayed their department-issued firearms and at all times carried a polite conversation with the Plaintiff. [ECF No. 224 at 18]. The United States, for its part, maintains that the record fails to create a genuine dispute of material fact for two reasons. First, it takes issue with the fact that Plaintiff did not adduce evidence that Osmanski was one of the officers she alleges entered her residence with a gun drawn. [ECF No. 228 at 13-14; ECF No. 261 at 5-6]. And second, assuming that Osmanski and the other officers entered Plaintiff's home with guns drawn, Plaintiff has not advanced any evidence showing that they pointed their guns at her, and that doing so was an unreasonable use of force. [ECF No. 228 at 13-14; ECF No. 261 at 5-6].

According to Plaintiff, she found a group of four law enforcement officers when she opened the door to her residence, among them Defendants Miranda and Decaire. [ECF No. 244 ¶¶ 10a, 13, 30a]. Plaintiff also points to the Massachusetts State Police Internal Investigation Report, providing Decaire's testimony that Osmanski "was at the front door." [ECF No. 246 ¶¶ 29a-29c; ECF No. 225-1 ¶ 17; ECF No. 225-3 at 16:10-17:21].[5] And, contrary to Defendants'

---

[5] It is the United States' position that the Court should ignore the Massachusetts State Police Internal Investigation Report because Plaintiff previously moved in limine to exclude the document as inadmissible. [ECF No. 261 at 6;

assertions, Plaintiff posits that the officers entered her residence with guns drawn, pointing them towards her. [ECF No. 244 ¶¶ 14a; 30b; ECF No. 246 ¶¶ 36a, 39a, 40a, 49a].

Viewing the record in the light most favorable to Plaintiff, genuine disputes of material fact remain that preclude the allowance of summary judgment. Indeed, a reasonable jury could find on this summary judgment record that Defendants Miranda and Decaire, as well as agent Osmanski, were among the officers initially stationed at the door, that they were armed, and that they drew their weapons. As it relates to the intent to cause imminent apprehension element of the claim, the United States maintains that just because the officers had their guns drawn, it does not necessarily lead to the conclusion that Defendants pointed their guns at Plaintiff. [ECF No. 228 at 13-14; ECF No. 261 at 5-6; ECF No. 262 at 5-6]. While the point is well taken, Plaintiff testified at her deposition that the officers pointed their guns at her, explaining that she would have gotten shot if the officers had pulled the trigger. [ECF No. 225-2 at 302:5-304:6].[6] And, in any event, Plaintiff points to her testimony that the officers were holding their weapons in front of them. [ECF No. 225-2 at 53:5-55:8; see ECF No. 244 ¶¶ 14a; 30b]. If the Plaintiff was standing generally in the vicinity of the door, a reasonable jury could find that the officers were indeed pointing in the direction of the Plaintiff.

It is for the same reason that the United States' final argument fails. In line with Model Penal Code § 3.07, Massachusetts permits law enforcement officers to use force as is reasonably

---

see generally ECF No. 204]. After continuing the trial, the Court terminated the motion without deciding. While it is true that on summary judgment a party must proffer evidence that would be admissible at trial, or evidence that could be presented in admissible form, Horta v. Sullivan, 4 F.3d 2, 8 (1st Cir. 1993), Defendant Decaire's deposition testimony, which is part of the admissible record, provides the same testimony. [ECF No. 225-3 at 16:10-17:21].

[6] The Court notes that, surprisingly, the Plaintiff failed to rely on this damning excerpt on either of her opposition briefs. While the Court has no independent obligation "to scour the record in search of a genuine issue of triable fact," it has discretion to consider the full summary record before it. See Lincoln Nat'l Life Ins. Co. v. Bonds, No. 23-10360-GAO, 2025 WL 470760, at *7 (D. Mass. Feb. 12, 2025); accord Foley v. Wells Fargo Bank, N.A., 772 F.3d 63, 79 (1st Cir. 2014) ("As we have previously warned in the summary judgment context . . . , we are not 'pigs hunting for truffles' in the record.'").

necessary to effect an arrest. E.g., Doe v. City of Worcester, No. 09-40191-FDS, 2012 WL

13191288, at *15 (D. Mass. Feb. 24, 2012); Dean v. City of Worcester, 924 F.2d 364, 369 (1st

Cir. 1991); Julian v. Randazzo, 403 N.E.2d 931, 934 (Mass. 1980). Although the summary

judgment record indicates that Kormah was considered to be armed or dangerous, [ECF No. 225-

3 at 27:16-28:4], suggesting that it might have been reasonably necessary for the officers to

exercise some level of force, a reasonable jury could likewise conclude that pointing a gun at

Plaintiff, a third party with whom they had some dialogue prior to her opening the door, was

excessive and unreasonable under the circumstances. Accordingly, summary judgment will be

denied as to all Defendants.

### E.    Count IX: Negligence (FTCA)

Under the doctrine of sovereign immunity, the United States is immune from suit unless

it has consented to be sued. Skwira v. United States, 344 F.3d 64, 72 (1st Cir. 2003) (citing

United States v. Mitchell, 445 U.S. 535, 538 (1980)). However, the Federal Tort Claims Act

("FTCA"), 28 U.S.C. §§ 1346(b), 2671-80, provides a limited waiver of sovereign immunity for

tort actions against the United States. Sosa v. Alvarez-Machain, 542 U.S. 692, 700 (2004). Under

the FTCA, individuals may sue the government "for injury or loss of property, or personal injury

or death caused by the negligent or wrongful act or omission of any employee of the Government

while acting within the scope of his office or employment." 28 U.S.C. § 1346(b)(1). Critically,

the FTCA's waiver of sovereign immunity is expressly limited to "circumstances where the

United States, if a private person, would be liable to the claimant in accordance with the law of

the place where the act or omission occurred." 28 U.S.C. § 1346(b)(1) (emphasis added); see

also 28 U.S.C. § 2674.

This limitation means that the waiver does not extend to claims that could not be brought against a private party under state law. As the Supreme Court explained in United States v. Olson, the FTCA waives sovereign immunity only "under circumstances" where local law would make a "private person" liable in tort. 546 U.S. 43, 44 (2005) (emphasis in original). Accordingly, constitutional tort claims premised on federal law fall outside the scope of the FTCA's limited waiver of sovereign immunity. See FDIC v. Meyer, 510 U.S. 471, 477-78 (1994) ("By definition, federal law, not state law, provides the source of liability for a claim alleging the deprivation of a federal constitutional right").

For the law enforcement context specifically, while the FTCA does waive sovereign immunity "with regard to acts or omissions of law enforcement officers of the United States government" for certain specified intentional torts, this waiver remains subject to the same fundamental limitation that liability must exist under state law against a private person. Here, "because a private citizen would not be liable for a claim advanced on the basis of constitutional rights related to search and seizure, the waiver does not extend to claims involving unlawful search and seizure or similar constitutional claims." Omran v. Bleezarde, No. 1:15-CV-00190-DBH, 2016 WL 5401018, at *5 (D.N.H. Aug. 26, 2016), report and recommendation adopted, 2016 WL 5394692 (D.N.H. Sept. 27, 2016), aff'd, No. 16-1638, 2018 WL 1840194 (1st Cir. Jan. 8, 2018). Summary judgment in the United States' favor is therefore appropriate.

## F.    Waived Claims

Defendants also moved for an entry of an order granting summary judgment as to Count IV (invasion of privacy), Count V (civil conspiracy), and Count VIII (intentional infliction of emotional distress). Plaintiff did not oppose or otherwise respond to any of Defendants' arguments. [ECF Nos. 245, 247]. Plaintiff similarly failed to address Defendants' waiver claims

at oral argument. [See ECF No. 263]. Because failure to respond to the movant's summary judgment arguments regarding a claim consists of abandonment of that claim, summary judgment is appropriate in Defendants' favor as to these counts. Montany v. Univ. of New Eng., 858 F.3d 34, 41 (1st Cir. 2017); Merrimon v. Unum Life Ins. Co. of Am., 758 F.3d 46, 57 (1st Cir. 2014).

### G.    Common Law Immunity

Defendants maintain that, to the extent Plaintiff's rights under state law have been violated, they are immune from liability. Applicable state law regarding immunity is binding on federal court with respect to state causes of action. See Hatch v. Town of Middletown, 311 F.3d 83, 91 (1st Cir. 2002) (applying Rhode Island law to determine whether police captain entitled to qualified immunity from state law privacy claim). Under Massachusetts common law, "a public official, exercising judgment and discretion, is not liable for negligence or other error in the making of an official decision if the official acted in good faith, without malice, and without corruption." Nelson v. Salem State Coll., 845 N.E. 2d 338, 348 (Mass. 2006). This is a distinct standard from the federal qualified immunity doctrine. See Nasir v. Town of Foxborough, No. 19-CV-11196-DJC, 2020 WL 1027780, at *8 (D. Mass. Mar. 3, 2020). This doctrine also takes "every presumption in favor of the honesty and sufficiency of the motives actuating public officers in actions ostensibly taken for the general welfare." Id. at *9 (quoting S. Bost. Betterment Tr. Corp. v. Bost. Redevelopment Auth., 777 N.E.2d 812, 820 (Mass. 2002)). However, an officer is not entitled to common law immunity if they act in "bad faith or [with] malice." Najas Realty, LLC v. Seekonk Water Dist., 821 F.3d 134, 144 (1st Cir. 2016). "To overcome this presumption, the plaintiff bears the burden of showing that the officials acted in bad faith or with malice." Bresler v. Muster, 258 N.E.3d 1134, 1146 (Mass. 2025) (citing Maxwell v. AIG Domestic Claims, Inc., 950 N.E.2d 40, 51 (Mass.

2011)). "Bad faith" is defined as a more than "bad judgment or negligence, . . . suggest[ing] a dishonest purpose or some moral obliquity, a conscious doing of wrong, or a breach of a known duty through some motive of interest or ill will," id., whereas "malice" is defined as a "wrongful act, done intentionally, without just cause or excuse," Brothers v. Town of Millbury, No. 14-CV-10122-TSH, 2014 WL 4102436, at *11 (D. Mass. Aug. 14, 2014).

Having considered all of Plaintiff's claims, only the assault claim remains viable. Despite Defendants' assertion of common law immunity, the Court finds that genuine disputes of material fact preclude a finding of summary judgment in their favor. At a minimum, a reasonable jury could conclude that Defendants acted with bad faith by immediately pointing their weapons at the Plaintiff upon opening the door to her residence, as well as taking actions that bore little to no relationship to their objective of locating and arresting Kormah, including ripping boxes, opening drawers, and pulling curtains. [ECF No. 244 ¶¶ 22, 23, 23a, 26a, 27a-b; ECF No. 225-2 at 58:15-59:19]; see Maroney as Trustee of Premiere Realty Trust v. Fiorentini, 673 F. Supp. 3d 30, 60 (D. Mass. 2023); Newman v. Massachusetts, 884 F.2d 19, 27-28 (1st Cir. 1989). Accordingly, common law immunity is inappropriate at this stage.

## IV.    **CONCLUSION**

For the foregoing reasons, Defendants Miranda and Decaire's Motion for Summary Judgment [ECF No. 223] is **GRANTED IN PART** and **DENIED IN PART**; and Defendant United States' Motion for Summary Judgment [ECF No. 227] is **GRANTED IN PART** and **DENIED IN PART**. Summary judgment is granted as to all counts except Plaintiff's unlawful

search claim (Count I) against Defendants Miranda and Decaire, and Plaintiff's assault claim (Count VI) against Defendants Miranda, Decaire, and the United States.[7]

**SO ORDERED.**

Dated: August 22, 2025

　*/s/ Margaret R. Guzman*　
Margaret R. Guzman
United States District Judge

---

[7] Since Kennedy did not move for summary judgment on Decaire's counterclaim for abuse of process, it will proceed to trial along with the surviving claims. See Conway v. Licata, 104 F. Supp. 3d 104, 112 n.6 (D. Mass. 2015).